STATE of Alaska, Petitioner,

v.

Thomas I'ANSON and Maureen I'Anson,
Respondents.

No. 2032.

Supreme Court of Alaska.

Nov. 29, 1974.

Charles P. Flynn and Theodore M. Pease, Jr., Burr, Pease & Kurtz, Inc., Anchorage, for petitioner.

Harland W. Davis, Anchorage, Joel E. Bradshaw and Russell W. Newman, Newman & Bradshaw, Inc. P.S., Seattle, Wash., for respondents.

Before RABINOWITZ, Chief Justice, and CONNOR, ERWIN, and FITZGERALD, Justices.

## OPINION

RABINOWITZ, Chief Justice.

This petition for review arises out of a bifurcated superior court trial in which the issue of petitioner State of Alaska's liability was tried to the superior court with the assistance of an advisory jury. The central contention in this petition focuses on construction of the discretionary function or duty exception to Alaska's Tort Claims Act.[1]

The automobile collision which led to the liability trial occurred in May 1970 at approximately Mile 63 of the Seward Highway near the entrance to the Granite Creek Campground. Between 7:30 and 8 p. m. on the day of the accident, John Ward was driving his car in a southerly direction on the Seward Highway. In the vicinity of the Granite Creek Campground he observed ahead an old Jeep pickup traveling from 15 to 20 miles per hour in a southerly direction.[2] According to Ward's testimony, he then blinked his lights and pulled out to pass the Jeep pickup; just as he was about to pass, the driver of the Jeep pickup pulled across the road in front of Ward whose vehicle then collided with the left rear portion of the Jeep.

Respondent Maureen I'Anson was a passenger in the Jeep pickup which was being driven by Andy DeBeau. DeBeau testified that just prior to the collision he was at-

---

1. AS 09.50.250 where applicable provides:

   A person . . . having a . . . tort claim against the state may bring an action against the state in the superior court. . . . However, no action may be brought under this section if the claim (1) . . . is an action for tort, and based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused . . . .

2. Ward testified that at this time he was travelling at 50 to 55 miles per hour.

tempting a left turn into the entrance roadway of the Granite Creek Campground. DeBeau further testified that the Jeep did not have operative electric turn signals and that he did not give a left turn hand signal, but he had "effectively" given a turn signal by pumping his brakes which in turn illuminated the Jeep's sole brake light which was located on the vehicle's left side. DeBeau admitted he observed Ward's vehicle approaching from the rear before he commenced the left turn.

As to the State of Alaska's liability for the collision and ensuing personal injuries sustained by respondent Maureen I'Anson, it was asserted that the state was negligent in failing to post a warning sign in advance of the entrance road to the Granite Creek Campground, and that the state should have placed no-passing striping between the crest of a slight rise north of the campground and the campground entrance roadway. The parties called expert witnesses who differed sharply over whether warning signs and no-passing zone striping should have been placed in the area immediately to the north of the entrance road to the Granite Creek Campground.

After hearing extensive testimony regarding the issue of liability, the advisory jury found in favor of petitioner State of Alaska. The trial judge in turn rejected the verdict of the advisory jury and entered findings of fact and conclusions of law resolving the issue of liability in respondents' favor. This petition followed.

Before treating the central question of whether highway signing and striping comes within the discretionary function or duty exception of AS 09.50.250, Alaska's Tort Claims Act, two minor issues will be dealt with.

Civil Rule 39(c) provides that:

In all actions not triable of right by a jury the court upon motion or of its own initiative may try an issue with an advisory jury or, with the consent of both parties, may order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right.[3] It is established that the trial court has discretion whether or not to use an advisory jury. In the event one is used, it is entirely within the trial court's discretion to accept or reject, in whole or in part, the verdict of the advisory jury.[4] On appeal from a trial conducted with an advisory jury, review is limited to the findings of fact and conclusions of law of the trial court as if there had been no verdict from the advisory jury.[5] There can be no review of asserted errors relating to rulings before and instructions to an advisory jury.[6] In light of these established principles, we do not reach petitioner's contention that the superior court erred in refusing to instruct the advisory jury in accordance with its requested instruction regarding the "dangerous condition doctrine."

The second minor issue presented by this review proceeding involves two closely related assertions of error. In its original petition for preview, the State of Alaska claimed that the superior court not only improperly viewed the scene of the accident but erroneously conducted experiments at the accident site. In his memo-

3. AS 09.50.290 provides that actions against the state under AS 09.50.250 "shall be tried by the court without a jury". Lee v. State, 490 P.2d 1206, 1208 (Alaska 1971).

Fed.R.Civ.P. 39(c), which parallels Alaska's Civ.R. 39(c), codifies the equity practice which permitted the court to summon an advisory jury to assist it in deciding a case. 9 Wright & Miller, Federal Practice and Procedure § 2335, at 124 (1971); Kohn v. McNulta, 147 U.S. 238, 13 S.Ct. 298, 37 L.Ed. 150 (1893).

4. Chicago & N. W. Ry. Co. v. Minnesota Transfer Ry. Co., 371 F.2d 129 (8th Cir. 1967); In re Pan-American Life Ins. Co., 188 F.2d 833 (5th Cir. 1951); Cudmore v. Smith, 260 F.Supp. 760 (D.C.Conn.1966).

5. Cox v. Babcock and Wilcox & Co., 471 F.2d 13 (4th Cir. 1972); Mallory v. Citizens Util. Co., 342 F.2d 796 (2d Cir. 1965).

6. Chicago & N. W. Ry. Co. v. Minnesota Transfer Ry. Co., 371 F.2d 129 (8th Cir. 1967); Frostie Co. v. Dr. Pepper Co., 361 F.2d 124, 125 (5th Cir. 1966).

randum decision, the trial judge wrote in part:[7]

> Certain facts evolved clearly from the testimony and were confirmed by a court view of the accident site and the approach to it from the north—the direction from which the vehicles involved in the accident were traveling. . . .
>
> .    .    .    .    .    .
>
> One observation by Thomas I'Anson in his testimony was confirmed by the court in taking a view of the scene. His statement was, substantially: 'You come over the hill and you are on it'. In approaching the scene at 50 miles per hour in a fairly heavy car equipped with good brakes, but without any special attempt to avoid an emergency situation, the court found that slowing from 50 miles an hour to a dead stop would be very difficult before reaching the campground entrance, in order to turn into it.

The subject of views by juries is governed by Civil Rule 48(c) which provides:

> When the court deems proper, it may order a proper officer to conduct the jury in a body to view the property which is the subject of the litigation or the place where a material fact occurred and to show such property or place to it. While the jury is making its inspection no one shall speak to it on any subject connected with the trial. The court may order the person applying for a jury view to pay the expenses connected therewith.

■ Civil Rule 48(c) embodies the notion that "The courts, like the prophet, have sensibly recognized that if a thing cannot be brought to the observer, the observer must go to the thing."[8] According to Dean Wigmore, the trial judge, sitting without jury, has been traditionally empowered to "proceed from the courtroom to the place in issue, whenever such a proceeding would be the suitable one for a jury, to take 'a view' in the narrower sense".[9] Thus, there was abundant authority for taking a view of the situs of accident by the trial judge in the case at bar. However, we note that the record is devoid of any indication as to whether counsel for the respective parties were present during the taking of the view by the court. Further, a reading of the superior court's memorandum opinion indicates that the trial judge might have conducted an experiment at the accident scene. Since the record before us is barren of any data surrounding the possibility that the trial judge did in fact conduct an impermissible experiment, this aspect of the case must necessarily be remanded in order to afford the parties an opportunity to develop the facts regarding both the alleged experiment by the court, and whether counsel were informed of and present during the court's carrying out of such experiment.[10] On remand, the trial court should not only insure that the record reflects the relevant facts pertaining to the alleged experiment but should also indicate what weight, if any, was accorded the experiment in deciding the liability issue.

We now turn to the central issue in this review proceeding, namely, whether the placement of traffic signs and highway

---

7. Pursuant to Civ.R. 52(a), the superior court's memorandum decision was filed with the intent of satisfying the rule's requirement of formal findings of facts and conclusions of law.

8. McCormick on Evidence § 216, at 537 (Cleary ed. 1972).

9. 4 Wigmore on Evidence § 1169, at 391 (Chadbourn Rev. 1972): McCormick on Evidence § 216 (Cleary ed. 1972); Greenburg v. Waterbury, 117 Conn. 67, 73–74, 167 A. 83, 85 (1933).

10. Professor McCormick writes:
    On the other hand, where the trial judge is present to rule on admissibility, and provision for proper preparation of a proper record is made, there would appear no inherent vice in receiving testimony or allowing demonstrations or experiments during a view. These practices, however, have often been looked upon with disfavor by appellate courts, and some jurisdictions appear to hold reception of testimony or experiments during a view improper under any circumstances.
    McCormick on Evidence § 216, at 538–39 (Cleary ed. 1972).

striping comes within the ambit of the discretionary function or duty exception of the Alaska Tort Claims Act.[11] Counsel for petitioner view the question as one which was left unanswered by our opinion in State v. Abbott, 498 P.2d 712 (Alaska 1972). Respondents' counsel, on the other hand, view *Abbott* as controlling. To a large extent we are in agreement with respondents' position and begin with a review of the relevant portions of *Abbott*.[12] In *Abbott*, we noted that the critical language in Alaska's Tort Claims Act, which establishes the discretionary function or duty exception of the State of Alaska's waiver of immunity, is identical to that contained in the Federal Tort Claims Act.[13] *Abbott* then proceeded to review relevant federal case law on the subject of the discretionary function exception. Our discussion commenced with an analysis of Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). There the Supreme Court of the United States held that the federal government's decision to carry out a fertilizer export program without testing the explosiveness of the ammonium nitrate contained in the fertilizer was within the federal act's discretionary function exception. In so holding, Justice Reed, writing for the Court, first articulated the planning-operational test for resolution of scope of discretionary function exception questions.[14] In light of the "almost unanimous" adverse reaction of legal commentators to *Dalehite* and the limitations placed on the decision by subsequent federal decisions, we concluded that *Dalehite* was "now of questionable authority." [15] Our evaluation of *Dalehite* was based in part upon analysis of Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); Rayonier, Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957),[16] and Eastern Air Lines, Inc. v. Union Trust Co., 95 U.S. App.D.C. 189, 221 F.2d 62, aff'd per curiam, 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955). We also noted that due to the widespread belief that the *Dalehite* majority carried the discretionary function exception too far, Justice Jackson's dissenting opinion in *Dalehite* is quoted as often as is the majority opinion.[17] Of particular significance is the fact that while we recognized that Justice Jackson "conceded there were many *policy* decisions of a regulatory or governmental nature which should properly be 'controlled solely by the statutory or administrative mandate and not by the added threat of private damage suits'" he would not extend the discretionary func-

---

11. Our formulation of the question parallels that of respondents. Petitioner, on the other hand, views the issue as whether the State of Alaska can be held liable for negligent design of its highways contending that design is exempted under the planning discretionary exclusion of the Alaska Tort Claims Act.

In this court's order granting review in the instant case, we requested the parties to brief the questions of whether the placement of traffic signs could be characterized as a planning discretionary function, or as an operational function, and if operational, what standard of care was required of the State of Alaska and its agents or employees in the circumstances of this case.

12. We recommend that the reader read in full Justice Erwin's incisive treatment of the subject of governmental immunity and the discretionary function or duty exception of both the Federal Tort Claims Act and Alaska's parallel legislation.

13. 28 U.S.C.A. § 2680(a).

14. By way of dictum, Justice Reed wrote:

In short, the alleged 'negligence' does not subject the Government to liability. The decisions held culpable were all responsibly made at a planning rather than operational level . . . .

Dalehite v. United States, 346 U.S. 15, 42, 73 S.Ct. 956, 971, 95 L.Ed. 1427, 1444 (1953).

15. State v. Abbott, 498 P.2d 712, 718 (1972).

16. In *Rayonier* the Supreme Court said in part that the Federal Tort Claims Act was founded on the premise that it is preferable to spread the cost of governmental "negligence" among all those who contribute financially to the government rather than allow the entire risk to fall on the injured party. Rayonier, Inc. v. United States, 352 U.S. 315, 319–320, 77 S.Ct. 374, 1 L.Ed.2d 358 (1957).

17. Reynolds, The Discretionary Function Exception of the Federal Tort Claims Act, 57 Geo.L.J. 81, at 95 (1968).

tion exception to "housekeeping" activities of the federal government.[18] In this regard, Justice Jackson stated:

> [T]here is no good reason to stretch the legislative text to immunize the Government or its officers from responsibility for their acts, if done without appropriate care for the safety of others. Many official decisions even in this area may involve a nice balancing of various considerations, but this is the same kind of balancing which citizens do at their peril and we think it is not within the exception of the statute.[19]

In *Abbott*, in addition to our discussion of federal case law, we emphasized several decisions of the Supreme Court of California in reaching the conclusion that "discretionary" acts should include only those made at the planning level, while decisions made at the operational or ministerial level should be actionable. In particular, we relied upon Johnson v. State, 69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352 (1968). There the court noted that almost any act involves some discretion, and therefore focused its inquiry on the policy behind the discretionary immunity doctrine. In so doing, the *Johnson* court recognized that

> the very process of ascertaining whether an official determination rises to the level of insulation from judicial review requires sensitivity to the considerations that enter into it and an appreciation of

the limitations on the court's ability to reexamine it. . . .

. . . . . .

. . . Courts and commentators have therefore centered their attention on an assurance of judicial abstention in areas in which the responsibility for *basic policy decisions* has been committed to coordinate branches of government. Any wider judicial review, we believe, would place the court in the unseemly position of determining the propriety of decisions expressly entrusted to a coordinate branch of government. Moreover, the potentiality of such review might even in the first instance affect the coordinate body's decision-making process. . . . (emphasis in original) [20]

We take this occasion to reaffirm our adoption in *Abbott* of the planning-operational test, within an analytical framework which is sensitive to the policies underlying the discretionary function or duty exception of Alaska's Tort Claims Act. In applying these analytical tools to the circumstances of the case at bar, we hold that the superior court did not err in refusing to extend the discretionary function exception to petitioner.[21] In the trial court, the questions in dispute turned on whether the state properly marked and striped a portion of the Seward Highway north of the Granite Creek Campground access road. In our view, functions of this

---

18. State v. Abbott, 498 P.2d 712, 718 (1972).

19. Dalehite v. United States, 346 U.S. 15, 60, 73 S.Ct. 956, 980, 97 L.Ed. 1427, 1453 (1953).

20. Johnson v. State, 69 Cal.2d 782, 73 Cal. Rptr. 240, 248, 447 P.2d 352, 360 (1968).
    In *Abbott*, we also noted that Professor Reynolds holds the view that the planning-operational distinction adequately serves what he regards as the main purpose of the discretionary function exception, namely: (1) The need to preserve separation of powers by limiting judicial re-examination of decisions made by the other branches of government; (2) the fact that courts are not equipped to investigate and balance all the factors that go into an executive or legislative decision; (3) the public interest in preventing the enormous and unpredictable liability that

could result from judicial re-examination of the decisions of the other branches of government. Reynolds, note 17 *supra* at 121–23, 128–31.

21. In his memorandum decision, the trial judge wrote in part: "The defendant State has plead a defense that no cause of action was stated by the plaintiff in the claim under the Alaska Claims Act. While not specified by the State, I assume this is the discretionary function defense asserted in an earlier tort action against the State (AS 09.50.250). In applicability of this defense to tort claims involving operational level decisions was settled in State v. Abbott, 498 P.2d 712, 717–721 (Alaska 1972). No further discussion is required of this defense".

nature do not involve broad basic policy decisions which come within the "planning" category of decisions which are expressly entrusted to a coordinate branch of government. We are further persuaded that resolution of questions such as whether or not the state properly striped or marked a portion of highway as it relates to the state's duty of care to users of the highway presents facts that courts are equipped to evaluate within traditional judicial fact-finding and decision-making processes.[22]

Our decision is in accord with the holding and reasoning of the Supreme Court of Hawaii in Rogers v. State, 51 Haw. 293, 459 P.2d 378 (1969). In *Rogers*, the state contended that its negligence in locating the road signs and restriping the center lines was not actionable under the discretionary function exception of Hawaii's tort liability act. More particularly, the state contended that

> discretion on the part of a State employee is involved in the placement of road signs and restriping of pavement in that road signs are placed after the district maintenance engineer has made a visual observation and has determined where and how they are to be placed, and center lines are restriped after the engineer has taken into consideration such factors as the geographical area involved, the amount of rain, and the volume of traffic in the area.[23]

Justice Marumoto, writing for the Supreme Court of Hawaii, rejected the state's contention. After discussing the history of the Federal Tort Claims Act and federal decisional authority, Justice Marumoto wrote:

> None of the cases mentioned above gave a precise definition as to what is meant by operational level acts. However, we may draw from the decisions in those cases, and others involving the discretionary function exception, a conclusion that operational level acts are those which concern routine, everyday matters, not requiring evaluation of broad policy factors.[24]

Employing this definitional framework, the Supreme Court of Hawaii concluded that:

> Here, such matters as the kinds of road signs to place and where to place them, and which center line stripings to repaint and when to repaint them, did not require evaluation of policies but involved implementation of decisions made in everyday operation of governmental affairs.[25]

Admittedly, application of the *Abbott* "planning-operational" distinction regarding levels of decision-making involves delicate degrees of judgmental values.[26] Although we recognize that it is not possible to articulate a rule which would provide more certainty, we remain convinced that the analytical approach adopted in *Abbott* is viable and will yield just results.

22. Inherent in our holding is the conclusion that no eroding of the separation of powers doctrine will result from a ruling that the functions in question are not within the ambit of the discretionary function exception of Alaska's Tort Claims Act.

23. Rogers v. State, 51 Haw. 293, 459 P.2d 378, 380 (1969).

24. *Id.*

25. *Id.* *Compare* Carroll v. State, Road Comm'n, 27 Utah 2d 384, 496 P.2d 888 (1972); Cameron v. State, 7 Cal.3d 318, 102 Cal.Rptr. 305, 497 P.2d 777 (1972). In *Carroll*, the court concluded that the decision of the road supervisor to use berms as the sole means of protection for the unwary traveler was not a basic policy decision essential to the realization or accomplishment of some basic governmental policy, program, or objective. His decision did not require the exercise of basic policy evaluation, judgment, and expertise on the part of the Road Commission. His determination may properly be characterized as one at the operational level of decision making . . . . (footnotes omitted) Carroll v. State, Road Comm'n, 27 Utah 2d 384, 496 P.2d 888, 891–892 (1972).

26. It appears that the Court of Appeals of Oregon would reach a different holding than we do in the instant case. Weaver v. Lane County, 10 Or.App. 281, 499 P.2d 1351 (1972).

A second issue the parties were requested to brief related to the standard of care required of the State of Alaska. More particularly, this court asked what is the appropriate standard of care required of petitioner's agents in the event the placement of traffic signs and striping are held to be operational functions rather than planning functions for purposes of the discretionary function exception to Alaska's Tort Claims Act. In response, petitioner State of Alaska has argued that "The State is to be judged by a standard of professional care in the same manner as a private engineer. To establish negligence on the part of the State or its agents, it is necessary to demonstrate professional malpractice". Respondents counter with the argument that the state's duty of care in the circumstances was established in State v. Abbott, 498 P.2d 712 (Alaska 1972). Again we find we are in agreement with respondents' position and think *Abbott* controlling.

In *Abbott*, we held that the state's duty of care to users of its highways "should be defined by ordinary negligence principles".[27] There we stated that the state "is not an insurer of the safety of motorists" and recognized that it is "the duty of highway authorities to exercise reasonable care to keep the highway in safe condition".[28] In deciding that this was the appropriate standard to employ, we were influenced by the fact that AS 09.50.250 "contains no in-

dication that the legislature intended the state should be held to a lesser standard of care than private individuals";[29] that AS 09.50.250 embodies a legislative decision in favor of risk-spreading; and that "While the negligence standard satisfies the strong public policy favoring compensation of individuals injured by the tortious conduct of the state, it is an extremely flexible standard, and consequently will not inhibit the vigorous and effective performance by the state of its duties in the way that a more rigid standard might".[30]

We are unpersuaded that our adoption in *Abbott* of ordinary negligence principles as the appropriate standard of care owed by the State of Alaska to users of its highways should be either abandoned or modified. Therefore, we hold that the superior court did not err in following ordinary negligence principles in deciding the liability issues in the case at bar. Thus, the appropriate standard of care required of petitioner and its agents was to use reasonable care to keep the highway in a safe condition for the reasonably prudent traveler.[31]

At trial the disputed issues concerning the state's alleged liability centered on whether or not the state should have placed a no-passing barrier stripe on the Seward Highway in the area leading up to the Granite Creek Campground entrance, and whether or not the state should have placed highway warning signs in advance of the campground roadway intersection

**27.** State v. Abbott, 498 P.2d 712, 724 (Alaska 1972).

**28.** *Id.*, 498 P.2d at 726, note 41, where case authorities from other jurisdictions adopting the same standard of care are collected.

**29.** *Id.*, 498 P.2d at 724.

**30.** *Id.*, 498 P.2d at 725. In this regard, Justice Erwin, writing for this court in *Abbott*, further elaborated:
Moreover, when the negligence standard is applied in conjunction with the policy-oriented interpretation of the discretionary function exception outlined in the previous section, the danger of excessive judicial interference with important decisions committed to the coordinate branches of government is avoided.

State v. Abbott, 498 P.2d 712, 725 (Alaska 1972).

**31.** Donnelly v. Ives, 159 Conn. 163, 268 A.2d 406, 408 (Conn.1970); Martin v. State, Dep't of Highways, 175 So.2d 441, 443 (La. App.1965), where the court stated, "Generally, it is the duty of the highway department to construct and maintain the highways . . . reasonably safe for a traveler himself exercising ordinary care; a highway will be deemed safe within these requirements if it may be negotiated successfully by all but the very reckless and careless drivers, there being no obligation to construct and maintain highways so as to insure the safety of such drivers".

with the Seward Highway.[32] Concerning the state's duty of care, AS 19.05.010 provides that the Department of Highways "is responsible for the planning, construction, maintenance, protection and control of the state highway system". AS 19.05.130 defines the term "maintenance" in part to encompass the preservation and operation of "highway facilities and services to provide satisfactory and safe highways". AS 19.-10.040 requires that "[t]he department shall classify, designate and mark highways under its jurisdiction and shall provide a uniform system of marking and posting these highways. The system of marking and posting shall correlate with and shall, as far as possible, conform to the recommendations of the Manual on Traffic Control Devices as adopted by the American Association of State Highway Officials".[33] At the time of the accident in question, the 1961 Uniform Manual of Traffic Control Devices provides in Section 2B–7 that:

> No-passing zones shall be established at vertical and horizontal curves and elsewhere on two and three lane highways where passing must be prohibited because of dangerously-restricted sight distances or other hazardous conditions.

During the trial the bulk of the professional engineering testimony received went to the issue of whether or not the entrance roadway to the Granite Creek Campground was an "other hazardous condition" within the ambit of Section 2B–7, although other theories of liability were advanced and evidence produced relating thereto by respondents.[34] All of which bring us to another aspect of the proceedings below which is raised by our review of the superior court's decision.

In his memorandum decision, the trial court concluded in part "that the State was negligent in failing, as a safety minimum, to provide a yellow no-pass barrier stripe on the Seward Highway, from the present southerly terminus of the existing barrier stripe about 663 feet to the north, and continuing south past the entrance to the Granite Creek Campground. This negligence was a legal cause of plaintiffs' damages." [35]

Study of the court's memorandum decision indicates that the trial judge found the following "facts" furnished the basis for his conclusions: John Ward could have stopped his vehicle before striking DeBeau's jeep, if he had known DeBeau was going to turn left; that Ward would not have pulled out if there had been a no-pass barrier stripe or a "do not pass" sign;[36] and that "the narrow road and lack of shoulder gave him no safe electives

---

32. More specifically, it was asserted that the State of Alaska was negligent in failing to place a yellow "no pass" barrier stripe, preventing southbound vehicles from legally passing, at the entrance of the Granite Creek Campground, and for an appropriate distance north.

33. AS 19.10.050 provides that:
    The department shall prescribe types of traffic control signals to regulate traffic on highways. These signals shall correlate with and, as far as possible, conform to the recommendations of the Manual on Uniform Traffic Control Devices as adopted by the American Association of State Highway Officials. The department shall prescribe uniform rules for the placing and installation of traffic control signals.

34. The trial court found it "immaterial that a no-passing banner stripe appears once to have been in existence along the stretch of road where the accident occurred. It is also of lit-

tle materiality to determine that, at the time of the accident, the junction of the campground with the Seward Highway be determined an 'intersection' ".

35. In an order entered subsequent to its memorandum decision, the superior court implemented and amended its findings of fact and conclusions of law in part by stating that the Court's decision was not based on dangerously restricted sight distance within the meaning of Sections 2b–7 and 2b–10 of the Manual of Uniform Traffic Control Devices . . . . [and] that the stopping sight distance of the junction of the Granite Creek Campground roadway and the Seward Highway was not a basis for the court's decision.

36. The trial judge also found that "If there had been a 'T' intersection sign, he would have passed, but would have travelled more slowly".

in evading the collision when he was committed to his pass, and it was too late to stop. He should not have been permitted to attempt a 'flying pass' at this location".[37]

Civil Rule 52(a) requires that in a nonjury trial or in an action tried with an advisory jury, the "[C]ourt shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment". In applying this rule, we have consistently said that it is the trial court's duty under this rule to make findings sufficient to give a clear understanding of the basis of its decisions in order to enable intelligent review on appeal.[38] Although the trial court's findings of fact and conclusions of

law embodied in its memorandum decision probably satisfy the requirements of Civil Rule 52(a) and the judicial construction this rule has received, we deem it appropriate on remand to afford the trial court the opportunity of making more detailed findings of fact pertaining to the negligence of the state, causation, and whether either or both of the parties to the collision failed to act in a reasonably prudent manner, and if they did, whether such conduct affects in any manner the state's liability in the circumstances of the case.[39]

Affirmed in part and remanded for further proceedings in accordance with this opinion.

BOOCHEVER, J., not participating.

---

**37.** In reaching this conclusion, the trial court gave particular emphasis to the testimony of two of respondents' expert witnesses. In his memorandum decision, the trial judge wrote in part:

It was the testimony of the expert witness Cysewski, who testified . . . that the circumstances at the accident scene, including the configuration of the road and the traffic control markings, encouraged an overtaking driver to make in effect an illegal pass in too short a space of time and space. In other words, Mr. Cysewski testified, the driver was entrapped by the circumstances.

. . . Mr. Bishop, a traffic engineer . . ., testified that the existence of the free passing zone beginning at the crest of the hill, 633 feet to the intersection, placed the driver of the passing vehicle within a dangerous condition, as he would have to complete his pass over a distance of 516

feet, otherwise he will be in the intersection during his pass.

**38.** Morrison v. State, 516 P.2d 402, 407 (Alaska 1973); Abbott v. State, 498 P.2d 712, 730 (Alaska 1972); Beaulieu v. Elliott, 434 P.2d 665, 670 (Alaska 1967); Patrick v. Sedwick, 413 P.2d 169, 174–175 (Alaska 1969); Hamilton v. Lotto, 391 P.2d 948, 949 (Alaska 1964).

**39.** Earlier we held that a remand is necessary in order to permit the parties and the trial court to develop the record pertaining to the court's view of the accident scene and carrying out an experiment. In this regard, we deem it advisable for the trial court to indicate not only what weight it accorded the results of any experiment conducted but also to review its memorandum decision in order to make any modifications necessitated by its supplemental findings regarding the view and experiment.