R.E., on his own behalf, D.E., on her own behalf, R.E. and D.E., as next friends and natural parents of J.E. and E.E., minors, Appellants,

v.

STATE of Alaska, Appellee.

No. S–5153.

Supreme Court of Alaska.

July 29, 1994.

Rehearing Denied Aug. 24, 1994.

**1342**

Robert C. Erwin, Erwin & Smith, Kenneth A. Norsworthy, Anchorage, for appellants.

Robert L. Eastaugh, Delaney, Wiles, Hayes, Reitman & Brubaker, Inc., Anchorage, for appellee.

Before RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Justice.

R.E., D.E., J.E. and E.E. (hereinafter D.E.[1]) claim that the State is liable to them for negligently licensing the day care center where J.E. and E.E. were sexually abused. D.E. appeals from the superior court's grant of summary judgment in favor of the State, and from the superior court's denial of her motion to compel further production of state records.

Because the undisputed facts indicate that the State was not negligent in processing and granting Betty Anderson's day care license, we affirm the grant of summary judgment to the State. We also affirm the superior court's refusal to compel further production of state records because the undisputed facts show that the Division of Family and Youth Services (DFYS) had no legal access to any state records that might have revealed Betty or Richard Anderson's propensity to sexually abuse children.[2]

## I. FACTS & PROCEEDINGS

In the summer of 1981, D.E. began looking for child care for her children, J.E. and E.E., ages fifteen months and five months respectively. She telephoned DSS based upon the following newspaper advertisement:

> PARENTS—A licensed child care program assures you of an acceptable level of care, nutritious meals, adequate program, [and a] safe and healthy environment. For information call Division of Social Services 274-5919.

She was informed that the agency screened day care operators for character and fitness before issuing them a license and conducted random spot checks on a routine basis to ensure compliance with safety regulations.

D.E. then obtained a referral list of licensed operators. She contacted most of the licensed operators on the list, but found no

---

1. D.E. is the wife of R.E. and the mother of J.E. and E.E., children who were sexually abused while attending Betty's Day Care, a home child care facility operated by Betty Anderson.

2. During the relevant period of time, child care regulatory duties were transferred from the Division of Social Services (DSS) to DFYS. The parties do not dispute that actions by DSS employees are chargeable to DFYS. Much of the testimony seems to refer to the two agencies interchangeably, and so many of the references herein are to DFYS even though DSS appears to have been responsible for initially licensing Betty and for early renewal of her license.

one who could take her two small children. One of the licensed operators referred D.E. to J.S. who, in turn, referred D.E. to J.S.'s mother, Betty Anderson. J.S. informed D.E. that although Betty was not licensed, she was certain that Betty planned to obtain a license.

D.E. met with Betty the next day at Betty's home. Betty showed D.E. around her house and explained what she was doing to child-proof the home in anticipation of becoming licensed. D.E. understood that Betty had called to find out about the licensing procedure but had not yet applied for a license. D.E. neither requested character references from Betty nor called to check on Betty's licensing progress prior to leaving her children in Betty's care. D.E. began leaving her children with Betty in August 1981, knowing that she was not yet licensed.

Betty applied for a license to operate a home day care facility on September 24, 1981. Her license application indicated that she and her husband, Richard Anderson, would be living in the home. She provided four non-related references and stated that neither she nor any member of her family had been convicted of a felony, and that she had never been deprived of her own children by court order. She also detailed the provisions she was making to child-proof the home, handle emergencies, and care for the children. The application did not directly inquire into the Andersons' propensity for child abuse nor did it request specific information on Richard.

Patricia Hermes, the DSS employee assigned to work on Betty's license application, sent out form letters to Betty's references and conducted a detailed inspection of Betty's home. The reply letters of reference, many of which came from friends and fellow church members who had previously left their children in Betty's care, were uniformly glowing. The standard-by-standard home inspection, conducted in November 1981, also revealed no problems. DFYS reviewed its Child Protective Service files and prior licensing records to determine whether Betty had ever been the subject of complaints or adverse licensing action, and found no negative information on either of the Andersons.

While these licensing preliminaries were proceeding, D.E. called DSS to ask whether Betty had applied for a state license. D.E. was told that Betty's license application was proceeding favorably, and that Betty would be receiving a license shortly.

After DSS completed its background check on the Andersons, Hermes recommended that Betty's Day Care facility be licensed for one year with possible annual renewals. Shortly thereafter, Hermes' supervisor reviewed the standard-by-standard evaluation and agreed that Betty's Day Care was in substantial compliance with all DFYS standards, thereby making licensing appropriate. On November 5, 1981, Hermes informed Betty that her facility was licensed through November 2, 1982.

D.E.'s children attended Betty's Day Care from August 1981 until July 1984. When DSS sent out letters to the day care parents in 1982 as part of its license renewal investigation, D.E. responded with a very favorable evaluation of Betty's child care abilities, reporting no suspicions or complaints about the care her children were receiving.[3] Because the other renewal references were also favorable and a new standard-by-standard evaluation revealed no problems, DFYS renewed Betty's license until November 2, 1983.

Another license renewal investigation was conducted in 1984. During this renewal inspection, all of the evaluation letters were positive, with the exception of one that stated that Betty "[p]erhaps spanks more than I would, but usually seems to use good judgment."[4] The home inspection turned up no negative information other than the fact that building materials from the Andersons' home

---

3. For example, D.E. answered the question "How would you feel about leaving your child in [Betty's] care?" by stating that she had peace of mind, and that the children were being cared for emotionally and nutritionally.

4. The record contains no evaluation letter from D.E. for the 1983 renewal period, although it appears from the record that DFYS sent her an evaluation form to fill out. D.E. maintains that she called DFYS three times between the fall of 1983 and May 1984 to report excessive discipline and overcrowding at Betty's home.

remodeling were in some proximity to the child care area. Betty's license was extended to November 2, 1984.

In the fall of 1983, D.E. began to have suspicions about the care her children were receiving at Betty's Day Care. One child hit his genitals, refused to keep his clothes on, acted out sexual behavior towards another child, and displayed other erratic behavior. The other child was verbally aggressive. D.E. and her husband discussed the possibility of finding another child care arrangement, but decided to keep the children with Betty. D.E. did not report her concerns to any municipal or state agency. In January 1984, D.E. left the children with the Andersons for several days while she and her husband took a vacation. In May 1984, D.E. called DFYS to report that Betty was overcrowding her day care. On May 30, Angela Clark, a DFYS day care licensing specialist, conducted an unannounced inspection of Betty's home and discovered seven children, two over the limit.

On July 5, 1984, D.E. received information that led her to closely question her children about the Andersons' treatment of them. The children told D.E. that Betty and Richard had repeatedly physically and sexually abused them and threatened them. D.E. immediately called DFYS to report the alleged abuse and did not return her children to Betty's Day Care after making her discovery. On July 12, DFYS notified Betty that her license had been revoked. In August 1984, DFYS received a complaint from D.W., Betty's daughter and Richard's step-daughter, that informed the agency that as a child she had been sexually abused by Richard and that he had fathered her child. Betty and Richard were later convicted of sexually abusing D.E.'s children.[5]

In 1986, D.E. filed suit, in part against the State and several state and municipal employees. In her amended complaint, D.E. alleged that DFYS was negligent in granting a child care license to Betty because the agency failed to conduct a meaningful investigation and discover the Andersons' propensity for sexual abuse. D.E. further alleged that DFYS breached its "duty of special care" not to "license and/or continue to license and approve unsuitable day care operators...." The complaint treated DFYS's advertisements and licensing as "referral[s]" that led D.E. to place her children with Betty.

During discovery, D.E. learned that D.W. had been treated at the Alaska Psychiatric Institute (API), a state hospital, during the early 1980's. D.E.'s attorney avers that "at some point prior to the date of issuance of the Anderson's [sic] day care license, [D.W.] reported her abuse by Richard Anderson to at least one state agency, to wit API." Because D.E. could not locate D.W. directly, she moved to compel the production of API records

> to determine if said files contain admissible evidence or information that may lead to the discovery of admissible evidence to prove ... that the State had knowledge of or reason to know of the Andersons' unfitness to hold a day care license at either the time the license was issued or some time during the license issuance but prior to the Plaintiffs' report of abuse in July 1984.

D.E. later moved to compel the production of Division of Vital Statistics and Work Incentive Program (WIN) records in an effort to discover the last known address of D.W.

In July 1991, after all other defendants had been eliminated from the suit, the State moved for summary judgment claiming that DFYS "owed or breached no duties to plaintiffs, and did not proximately cause them injury." The State further claimed that DFYS was immune from suit under AS 09.-50.250(1). The State supported its motion with the Anderson licensing file and many affidavits from current and former DFYS employees who had been in positions of authority during the early 1980's.[6] An affidavit

---

**5.** After the Andersons' initial convictions, the court of appeals found procedural defects in their trials and ordered new trials. *See Anderson v. State,* 749 P.2d 369 (Alaska App.1988). Both pled no contest on remand, and the superior court sentenced them to prison terms.

**6.** The thrust of these affidavits is that, given the practical limitations of government, DFYS inves-

from API's top hospital administrator stated that the law requires all API patient records to be kept confidential, and that API would not have revealed any information regarding D.W. or other patients even if DFYS had asked for such information. Finally, an affidavit from the police sergeant who led the criminal investigation of Richard and Betty Anderson stated that the National Crime Information Center computer had no recorded convictions or arrests for either Betty or Richard prior to July 1984.

The superior court issued an oral ruling granting DFYS's motion for summary judgment. It ruled that because the injuries were not foreseeable, DFYS could have breached no duty. It also noted that proximate cause and moral blameworthiness were absent. It further determined that even if there was a duty, the State was protected by discretionary immunity. The superior court also denied D.E.'s motion to compel further discovery.

This appeal followed. D.E. raises two issues on appeal. First, she argues that the superior court erred in granting the State summary judgment. D.E. maintains that DFYS should have investigated the Andersons more thoroughly by (1) interviewing Richard, who was also living in the home; (2) interviewing J.S. and D.W., Betty and Richard's adult children; (3) conducting criminal background checks and/or asking other state agencies whether they had information bearing on the applicant's fitness to care for children; and (4) inquiring into the Andersons' mental history, including asking whether they had been sexually abused as children. Second, she alleges that the superior court erred when it denied her motion to compel further discovery.

## II. STANDARD OF REVIEW

■ Three standards of review are relevant to this appeal. When reviewing a grant of summary judgment, we independently "determine whether any genuine issue of material fact exists and whether the moving party is entitled to judgment on the law applicable to the established facts." *Wright v. State*, 824 P.2d 718, 720 (Alaska 1992). In doing so we must draw all reasonable inferences in favor of the non-moving party. *Id.* We resolve the questions of law presented in this appeal using our independent judgment. *Loeb v. Rasmussen*, 822 P.2d 914, 917 (Alaska 1991). We apply an abuse of discretion standard to the discovery issue. *McBirney & Assocs. v. State*, 753 P.2d 1132, 1139 (Alaska 1988).

## III. THE SUMMARY JUDGMENT MOTION

### A. Duty

■ The superior court held that DFYS assumed "no special duty to prevent [the] sexual abuse" that occurred at Betty's Day Care. D.E. argues that DFYS undertook to protect children from sexual abuse in licensed day care facilities and that this undertaking gave rise to a common law duty for DFYS to use due care in performing its licensing and investigatory function.[7] DFYS

tigated and licensed Betty's Day Care in a professional manner and followed all applicable statutes, regulations and department policies. DFYS had to prioritize functions because of its small staff and limited budget. As a result, child protection and other functions were deemed more important than some licensing investigation functions. DFYS employees further claim that DFYS did not have the resources to carry out the type of investigation that D.E. claims should have been done. One employee also avers that DFYS made a specific policy decision not to conduct overly intrusive licensing investigations of day care homes, as opposed to day care centers, because members of the public and the legislature were concerned that such investigations could lead to unnecessary invasions of privacy; lower willingness among day care providers to become licensed and thus receive *some* inspec-

tion and review; and a reduction in the overall number of day care providers. Due to these concerns, DFYS created a standard-by-standard evaluation form used in licensing all home child care facilities, including Betty's Day Care.

7. D.E. also argues that the child care licensing statutes, regulations and some general legislative statements of purpose impose a statutory duty on DFYS to investigate applicants for day care licenses in order to safeguard the well-being of children in Alaska. We need not address this issue because, as DFYS points out, D.E. never argued for the existence of a statutory duty in opposing the summary judgment motion and inadequately briefed the issue on appeal. *See Alesna v. LeGrue*, 614 P.2d 1387, 1392 n. 9 (Alaska 1980) (declining to address a negligence theory

responds that, in the absence of "red flags" indicating that a potential licensee has a propensity to commit such abuses, the agency has no general.duty to protect children from abuse.

Other courts that have examined this issue have arrived at varied conclusions. Some have held that the state owes a special duty of care to users of state-licensed day care facilities. *See, e.g., Andrade v. Ellefson*, 391 N.W.2d 836, 843 (Minn.1986) (holding that "small children in a licensed day care facility are a particular protected class"); *Brasel v. Children's Servs. Div.*, 56 Or.App. 559, 642 P.2d 696, 699 (1982) (holding that state owed duty to plaintiff users of a state-certified day care facility as members of a protected class); *Gagnon v. State*, 570 A.2d 656, 659 (R.I.1990) (holding that the state may have a special duty to supervise licensed day care facilities, but noting that "a claim of negligent licensing does not allege anything more than a statutory obligation owed by the state to the public-at-large"); *C.T. v. Martinez*, 845 P.2d 246, 248–49 (Utah 1992) ("Because the licensing provisions were intended to protect patrons of licensed day-care facilities, a special relationship exists between [the state agency] and those patrons.").

Other courts, however, have ruled that no special relationship exists between the state and patrons of a licensed day care facility regarding the issue of negligent licensing, and that a duty owed to the public-at-large does not create a duty to any particular person. *See, e.g., MacDonald v. State*, 230 Cal.App.3d 319, 281 Cal.Rptr. 317, 327 (1991) (holding that public entities assumed no duty of care toward the abused child that was any greater than that owed to any other member of the public); *Willow Tree Learning Ctr., Inc. v. Prince George's County*, 85 Md.App. 508, 584 A.2d 157, 160–62 (1991) (refusing to find an individual duty to the plaintiffs). *See generally*, Danny R. Veilleux, Annotation, *Governmental Liability for Negligence in Licensing, Regulating, or Supervising Private Day–Care Home in Which Child Is Injured*, 68 A.L.R.4th 266 (1989).

that "was not raised below and [wa]s inadequate-

### 1. *The D.S.W. Factors*

 In determining whether the State owes a duty of care to the appellants, we consider a number of factors:

 The foreseeability of harm to the plaintiff, [2] the degree of certainty that the plaintiff suffered injury, [3] the closeness of the connection between the defendant's conduct and the injury suffered, [4] the moral blame attached to the defendant's conduct, [5] the policy of preventing future harm, [6] the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and [7] the availability, cost and prevalence of insurance for the risk involved.

*See D.S.W. v. Fairbanks N. Star Borough Sch. Dist.*, 628 P.2d 554, 555–56 (Alaska 1981) (quoting *Peter W. v. San Francisco Unified Sch. Dist.*, 60 Cal.App.3d 814, 131 Cal.Rptr. 854, 859–60 (1976)) (adopting this method in a negligence action against a school district).

We first address foreseeability, the single most important criterion for imposing a duty of care. *See Division of Corrections v. Neakok*, 721 P.2d 1121, 1125 (Alaska 1986). In *Neakok*, we applied the *D.S.W.* factors in a case involving the State's alleged negligent supervision of a parolee. *Id.* at 1124–25. We held that the State "had a duty to supervise [a dangerous parolee] carefully [and] that this duty extended to anyone foreseeably endangered by him...." *Id.* at 1136. We reasoned that the dangerous parolee's victims were foreseeable and were significantly more identifiable than members of the public in general, because the parolee was released into an isolated village of less than 100 people that lacked resident law enforcement officers. *Id.* at 1123, 1129, 1131–32. We thus held that the trier of fact was not precluded from finding that the State had a duty to warn the village residents. *Id.* at 1132 n. 17.

Although DFYS contends that sexual abuse was not foreseeable at the time it licensed Betty's day care facility, this assertion is without merit. Sexual abuse was a prevalent social concern in the early 1980's.

ly briefed on appeal").

*See, e.g.*, Ch. 104, SLA 1982 (amending child protection law to include a reporting requirement for "sexual abuse or sexual exploitation"); former 7 AAC 50.205(f) (am. 9/28/85) (providing that "[a] caregiver may not physically or sexually abuse a child"). The fact that the State sought to regulate this area suggests that it recognized the vulnerability of young children left with strangers. The most important *D.S.W.* factor is met.

The other *D.S.W.* factors also favor imposing a duty of care on the State regarding its investigation and licensing of child care facilities. On appeal, the State does not dispute that the Appellants have suffered greatly, or that the injury occurred as a result of incidents at Betty's Day Care. Although a licensing agency cannot be charged with preventing all such abuse, the agency's responsibility is a serious one. Incompetent or haphazard licensing investigations contribute to problems, and are morally blameworthy. The existence of the many laws and governmental agencies designed to aid and safeguard children demonstrates that the protection of a child's welfare is the responsibility not only of the child's parents, but also of society and government.[8] Strict adherence to the laws and licensing procedures should result in a lower incidence of child abuse.

The sixth *D.S.W.* factor draws attention to the practical difficulties and the negative consequences that will almost certainly result from a decision requiring DFYS to use due care in conducting its licensing and investiga-

tions of day care facilities in order to protect children from potential physical and/or sexual abuse. There is a risk, for example, of encouraging "defensive social work," or intervention where it is not needed. *See* Douglas J. Besharov, *Protecting Children From Abuse: Should It Be a Legal Duty?*, 11 U.Dayton L.Rev. 509, 547–48 (1986). We are also wary of exposing a "deep pocket" regulatory authority to possible tort liability for the purely criminal acts of licensed child care providers.

Nonetheless, we hold that on balance the *D.S.W.* factors indicate that the State owes a duty of care to patrons of licensed day care facilities. The State's duty is not, as D.E. assumes, to prevent harm: it is only to take reasonable steps to prevent harm.[9] The burden of acting nonnegligently with regard to the areas an agency has chosen to regulate is not so great as to outweigh the arguments in favor of imposing a duty.[10]

### 2. *Common–Law Principles*

Our holding is consistent with the common-law duty to exercise reasonable care that arises when there is a special relationship because a party has "undertaken a responsibility" to protect others. *See City of Kotzebue v. McLean*, 702 P.2d 1309, 1312–13 (Alaska 1985); *Adams v. State*, 555 P.2d 235, 240 (Alaska 1976); Restatement (Second) of Torts §§ 314, 315, 323, 324A (1965).

8. While we note that licensing of a particular facility could lower a parent's guard and increase the risk of harm, parents have the primary responsibility for ensuring the safety of their child's day care situation. Our holding today should not be read as allowing them to abdicate that responsibility. As any parent should be aware, DFYS has neither the resources nor the practical ability to inspect a child care facility with the same degree of care as a parent who visits the facility on a regular basis.

9. We also specifically reject the argument that the newspaper advertisement created an absolute duty to protect all children in child care.

10. In *Neakok*, we rejected the State's "generalized arguments" that

the burdens and consequences of imposing financial liability for failure to supervise adequately would be severe and unwarranted [and] ... the imposition of such a duty would

cause "intolerable judicial interference with judgmental corrections' decisions" and impose an economic burden, "reordering [S]tate priorities in allocating manpower and funds" and causing other socially desirable programs to suffer.

721 P.2d at 1130. In doing so, we noted that we were not requiring the State to "spend limitless sums of money taking every conceivable precaution to prevent any possible violent action on the part of any parolee." *Id.* We have never required that the State do a flawless job in governing, nor do we believe that the State should be "liable in tort to everyone for every action." *Adams*, 555 P.2d at 242. We do not seek to hold the State liable for every instance of child abuse that occurs at a state-licensed day care facility, only those that would have been prevented by the State's exercise of reasonable care in implementing the policies in place at the time of licensing.

 The traditional common-law rule is that there is no general duty to safeguard others from foreseeable harm when that would require controlling the conduct of another person or warning of such conduct. *Neakok*, 721 P.2d at 1125–26; Restatement (Second) of Torts § 314 ("The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."). An exception to this rule is when there is a special relationship between the actor and either a dangerous person or a potential victim. *Neakok*, 721 P.2d at 1126; *see also* Restatement (Second) of Torts § 315.

One kind of special relationship exists when one voluntarily undertakes to render services, even gratuitously, to another. *See* Restatement (Second) of Torts § 323. Such a person is subject to liability for failure to exercise reasonable care in performing such services. *McLean*, 702 P.2d at 1313; *Adams*, 555 P.2d at 240; Restatement (Second) of Torts § 323. *Adams* is particularly relevant here, because it involved a state regulatory activity, fire inspection, that closely parallels the type of investigation that DFYS undertook in licensing day care facilities. Detailed statutes and regulations govern both activities. Both activities are performed to lessen the danger to members of the general public who use the inspected facilities. And both activities tend to create some degree of reliance on the part of the general public based on the assumption that the inspected facilities are safe.

In *Adams*, a fire inspection revealed the existence of severe fire hazards in a hotel. 555 P.2d at 239. Although the state fire officials discussed the hazards with the hotel manager and promised a more formal notification of fire code violations, they took no further action. *Id.* at 240. Thereafter, a fire at the hotel caused many deaths and injuries. *Id.* at 236, 238. We held that once a state fire inspector has undertaken to inspect a building, the State will be held to a duty of reasonable care. *Id.* at 240. We further observed that the State can be held liable not only for negligently failing to *abate* a known fire hazard, but also for the negligent failure to *discover* fire hazards. *Id.*

In this case, the State voluntarily undertook to license day care facilities.[11] DSS investigated Betty's Day Care, and issued it a license. Presumably, the effect of state licensing was to instill a greater feeling of security in parents who utilized the licensed day care facilities.[12] Having undertaken the responsibility of licensing, the State was under a duty to exercise reasonable care in carrying out that function.

### B. *Immunity*

#### 1. *The Discretionary Function Exception*

 The State argues that AS 09.50.250 immunizes DFYS from liability regarding D.E.'s claims. We disagree. Alaska Statute 09.50.250(1) in part provides immunity to the State for performance of its discretionary functions.[13] In particular, the statute prohibits tort actions against the State "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused." AS 09.50.-250(1). It does not, however, provide immunity when the State fails to exercise due care in carrying out its own policy, rules and regulations. *Neakok*, 721 P.2d at 1134–35; *Adams*, 555 P.2d at 243–44.

---

11. *Cf.* Susan L. Abbott, *Liability of the State and Its Employees for the Negligent Investigation of Child Abuse Reports*, 10 Alaska L.Rev. 401, 409 (1993) ("in undertaking to receive and inquire into reports of child abuse, the State has voluntarily assumed a duty to use due care in investigating the reports and protecting abused children").

12. This is, for example, the likely effect of the newspaper advertisement placed by DSS "assur[ing parents] of an acceptable level of care,

nutritious meals, adequate program, [and a] safe and healthy environment."

13. At least one commentator has argued that discretionary immunity should be abolished in the analogous situation of caseworkers who negligently fail to intervene to stop intra-family abuse. *See* Laura Huber Martin, Comment, *Caseworker Liability for the Negligent Handling of Child Abuse Reports*, 60 U.Cin.L.Rev. 191, 193 (1991). Such a decision is for the legislature.

In our previous decisions construing the discretionary function exception of AS 09.50.-250(1), "we have employed a 'planning level-operational level' test to distinguish between decisions involving the formulation of basic policy, entitled to immunity, and decisions regarding only the execution or implementation of that policy, not entitled to immunity." *Industrial Indem. Co. v. State*, 669 P.2d 561, 563 (Alaska 1983).[14] Actions that are operational in nature, and therefore not entitled to discretional immunity, are those that involve either no room for discretion or involve only discretion free from policy considerations. *See Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536–37, 108 S.Ct. 1954, 1958–59, 100 L.Ed.2d 531 (1988) (interpreting Federal Tort Claims Act); *United States v. Gaubert*, 499 U.S. 315, 324–25 & n. 7, 111 S.Ct. 1267, 1274–75 & n. 7, 113 L.Ed.2d 335 (1991) (interpreting Federal Tort Claims Act); *see also Johnson v. State*, 636 P.2d 47, 64–66 (Alaska 1981); *Japan Air Lines Co. v. State*, 628 P.2d 934, 936–38 (Alaska 1981); *State v. I'Anson*, 529 P.2d 188, 192–93 (Alaska 1974); *State v. Abbott*, 498 P.2d 712, 717–22 (Alaska 1972).[15]

In *Berkovitz*, the United States Supreme Court examined federal discretionary function immunity in the context of an agency's exercise of its licensing authority. 486 U.S. at 533, 108 S.Ct. at 1957. The Court held that when federal regulations required that the agency receive certain information before issuing a license, the agency had no discretion to issue a license without having first received that information. *Id.* at 542–43, 108 S.Ct. at 1961–62. Therefore, the agency was not immune from liability for failing to comply with the regulations:

[T]he discretionary function exception bars any claims that challenge the [agency's] formulation of policy as to the appropriate way in which to regulate. . . . In addition, if the policies and programs formulated by the [agency] allow room for implementing officials to make independent policy judgments, the discretionary function exception protects the acts taken by those officials in the exercise of this discretion. . . . The discretionary function exception, however, does not apply if the acts complained of do not involve the permissible exercise of policy discretion. Thus, if the [agency's] policy leaves no room for an official to exercise policy judgment in performing a given act, or if the act simply does not involve the exercise of such judgment, the discretionary function exception does not bar a claim that the act was negligent or wrongful.

*Id.* at 546–47, 108 S.Ct. at 1964.

Our previous decisions regarding state liability for negligent design or maintenance of state-owned public facilities illustrate the distinction between policy decisions and operational level decisions. We have noted that while the proper design and the appropriate level of maintenance may involve some discretion, that discretion must be exercised within the confines of the original objective.[16]

We do not seek to usurp DFYS's policy-making function by proposing how DFYS should have allocated its resources. We merely hold that, *"within the confines of [then] existing policies and budgetary constraints,"* DFYS had the duty to exercise due care in performing its functions. *Neakok,* 721 P.2d at 1130 (emphasis added). Once DFYS formulated its original policy, it was required to act within the confines of that

---

14. Any argument that DFYS should have employed different or additional procedures to make its investigations more effective implicates formulation of basic policy. Such decisions would be immune under AS 09.50.250(1).

15. Because the critical statutory language of the discretionary function exception in AS 09.50.-250(1) is identical to that contained in the Federal Tort Claims Act, reliance on federal court interpretation of the exception is appropriate. *See Abbott*, 498 P.2d at 717.

16. For example, a decision to maintain a road is necessarily a decision to maintain it properly, and a decision to build an airport for wide-body jets does not allow for discretion in deciding whether to design taxiways that will accommodate the jets. *I'Anson*, 529 P.2d at 193–94; *Japan Air Lines*, 628 P.2d at 936–38. Some design or maintenance decisions, however, do involve policy considerations, such as the proper allocation of limited resources and possible detrimental physical and environmental effects. *See Freeman v. State*, 705 P.2d 918, 920 (Alaska 1985); *see also Wainscott v. State*, 642 P.2d 1355, 1357 (Alaska 1982).

policy or be exposed to liability for failure to do so.

### C. Breach of Duty

■ The question that remains is whether there is a genuine issue of material fact as to whether DFYS breached its duty to exercise reasonable care. D.E. points to a number of facts that she claims established a genuine issue of material fact.[17] These stem exclusively from DFYS's actions during the pre-licensing process. She claims that DFYS should have (1) interviewed Richard, Betty and Richard's adult children, and neighbors of the Andersons; (2) inquired about the Andersons at localities in which they previously resided; (3) conducted a criminal background investigation; (4) reviewed files of other State agencies; and (5) inquired into mental health problems and past instances of child abuse.[18]

D.E.'s assertions that there were genuine issues of material fact are based on 7 AAC 50.205 which states in part:

(a) An adult who resides in a family child care home . . . may not

 (1) have a history of abusing or neglecting a child or dependent adult;

 (2) have a physical, mental, or substance abuse problem to the extent that it adversely affects the health and safety of children in care; [and]

 (3) abuse or neglect a child or dependent adult. . . .

 . . . .

(b) The division will, in its discretion require references from a physical or mental health care professional attesting to a person's freedom from the conditions identified in (a)(1)—(2) and to that persons's capacity to provide child care.

This provision was not in effect at the time of the alleged abuse,[19] however, and therefore cannot be a basis for a finding that a genuine issue of material fact exists as to breach. To the extent that the briefed allegations of factual issues go to conscious policy choices, they are covered by discretionary immunity. D.E. has failed to show any facts in the pre-licensing process that create a genuine issue of material fact as to whether or not DFYS could be liable, and hence summary judgment was proper.

## IV. THE DISCOVERY RULING

■ The superior court denied D.E.'s motions to compel the production of API, WIN and Vital Statistics files, because it concluded that production of these items would not lead to the discovery of admissible evidence capable of defeating summary judgment. See Alaska R.Civ.P. 26(b), 37(a). D.E. sought these materials in order to prove that DFYS knew or should have known prior to July 1984 that D.W. had been sexually abused by Richard. DFYS's response on this issue is straightforward and compelling—the undisputed affidavits, deposition testimony, and state confidentiality statutes all indicate that DFYS officials had no access to any information contained in these files. Thus, their contents are irrelevant to D.E.'s case. We concur with this analysis and affirm the superior court's order denying discovery.

## V. CONCLUSION

We AFFIRM the superior court's order granting summary judgment to the State.

MATTHEWS, J., concurs.

MOORE, C.J., not participating.

---

**17.** In addition to those discussed here, there appear to have been other significant factual questions below, such as whether DFYS responded adequately to complaints and conducted spot checks in accordance with its policy. D.E. has not raised these on appeal; her brief focuses on the pre-licensing investigation. Consequently, she has waived them. See Wren v. State, 577 P.2d 235, 237 n. 2 (Alaska 1978).

**18.** D.E. relies on the licensing application form, which asked "Has applicant or member of the household ever been convicted of a felony?" On this point, however, D.E. fails to allege that Richard had been convicted of a felony, and that therefore a more thorough investigation of his criminal history would have affected the licensing decision.

**19.** Prior to 1985, 7 AAC 50.205 only required day care home caregivers to have an annual tuberculosis test, meet minimum age requirements (with some exceptions), and provide three unrelated references.

MATTHEWS, Justice, concurring.

I agree that the superior court properly granted summary judgment to the State. I write separately because I believe that the State is immune from liability regarding D.E.'s claims under the discretionary function exception of AS 09.50.250(1).

D.E.'s claims as presented on appeal focus on DFYS's actions during the pre-licensing process. D.E. essentially claims that DFYS negligently failed to conduct a more thorough investigation. The State's decision not to adopt a more extensive means of investigating applicants and other adult residents of family day care homes, however, is clearly a discretionary act based on policy considerations.[1]

The applicable regulations do not specifically require that DFYS follow any particular means of investigating applicants and other adult residents of applicant households, at least not in any way relative to discovering possible abusive tendencies. DFYS therefore retained discretion to formulate an investigative procedure. DFYS has demonstrated, through unrefuted affidavits, that it exercised this discretion by adopting a policy of not investigating non-applicant residents of family child care homes and investigating applicants in only a limited number of ways. The decision to conduct only a limited investigation of applicants was based on consideration of such factors as the proper allocation of limited resources and the need to avoid excessive intrusion into the private lives of applicants and to encourage providers to seek licenses. This court has previously rec-

ognized that most allocation of resources decisions are policy based. *See Freeman v. State,* 705 P.2d 918, 920 (Alaska 1985) ("Decisions concerning the allocation of available funding are often immune from suit under the discretionary function exception.") The other factors relied on by DFYS are also policy based. The discretionary function exception therefore bars claims based on DFYS's decision not to investigate applicants like Betty Anderson more thoroughly.

DFYS's decision not to engage in any extensive investigation of other residents of family child care homes (or of the emergency provider listed by the applicant) was based on the same considerations, as well as a perceived ability on the part of licensees to choose appropriate cohabitants and emergency back-ups. Whatever the actual wisdom of such a decision, the discretionary function exception prevents this court from re-examining an executive branch agency's resolution of an issue entrusted to its policy discretion. *See Wainscott v. State,* 642 P.2d 1355, 1357 (Alaska 1982).

I would therefore hold that the State is immune from liability under AS 09.50.250(1) for not having engaged in a more thorough investigation of the Andersons.

---

1. As the majority opinion states: "Any argument that DFYS should have employed different or additional procedures to make its investigations more effective implicates formulation of basic policy. Such decisions would be immune under AS 09.50.250(1)." Op. at 1349 n. 14.