**CONSERVATORSHIP ESTATE OF K.H., Appellant/Cross–Appellee,**

v.

**CONTINENTAL INSURANCE COMPANY; Community Advocacy Project of Alaska, Inc.; Professional Guardian Services Corporation; and David Schade, Appellees/Cross–Appellants.**

Nos. S–9949, S–9959.

Supreme Court of Alaska.

June 20, 2003.

Rehearing Denied July 30, 2003.

Robert S. Noreen, Law Office of Robert S. Noreen, Fairbanks, for Appellant and Cross–Appellee.

Christopher E. Zimmerman, McConahy, Zimmerman & Wallace, Fairbanks, for Appellee and Cross–Appellant Continental Insurance Company.

James D. Oswald, Song Oswald & Mondress, PLLC, Seattle, Washington, and Ronald Bliss, Bliss, Wilkens & Clayton, Anchorage, for Appellee and Cross–Appellant Community Advocacy Project of Alaska, Inc.

David W. Pease, Burr, Pease & Kurtz, Anchorage, for Appellees and Cross–Appellants Professional Guardian Services Corporation and David Schade.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

FABE, Chief Justice.

## I. INTRODUCTION

K.H.'s inheritance was rapidly depleted while he was in the care of professional guardians. He sued two prior guardians, the first for breach of fiduciary duty and the second for fraud. The superior court dismissed the claims against both guardians on statute of limitations grounds. However, because neither guardian filed a final accounting that fully disclosed all financial matters, thus triggering the six-month statute of limitations, we reverse the order granting summary judgment in favor of both guardians.

1. In reviewing a grant of summary judgment, we draw all reasonable inferences in favor of the non-moving party. *Nichols v. State Farm Fire &*

## II. FACTS AND PROCEEDINGS

### A. Factual History[1]

#### 1. K.H.'s personal background

After K.H. graduated from high school in 1962, he enlisted in the United States Navy. He served through 1966, at which time he was honorably discharged. He then moved to Alaska, and in 1969 he began to experience the onset of the prodromal phase of schizophrenia. He was first hospitalized at the Alaska Psychiatric Institute in 1973 after being arrested for trespassing. He was subsequently hospitalized twelve additional times in Alaska, and was admitted to a number of Veterans Administration (VA) hospitals in Wisconsin and Illinois. From 1976 to the present, K.H. participated in various community mental health programs in Alaska.

K.H. now suffers from paranoid schizophrenia, possible organic brain syndrome, and glaucoma. His mental illness is long-standing and chronic. He suffers auditory hallucinations, diminished concentration and attention span, and periodic difficulties with anger management. His illness makes it impossible for him to provide for himself both physically and financially and, when left alone, he has a tendency to deteriorate considerably. He is also unable to manage money, being unaware of the source of his income or monthly expenses. He currently receives Social Security and a VA pension. After his expenses are paid, he has approximately $75 left each month. He has never married, nor had any children. He does not remember the names or locations of his remaining family members. K.H. currently resides in a supervised, semi-independent apartment operated by Fairbanks Community Mental Health Center. He will always need supervision and a structured environment.

#### 2. The conservatorship and guardianship

In 1992 K.H. received an inheritance of $92,172.32. This prompted a petition for conservatorship and, in September 1992, the

*Cas. Co.,* 6 P.3d 300, 303 (Alaska 2000). Therefore, K.H. receives the benefit of all factual inferences.

superior court appointed Community Advocacy Project of Alaska (CAPA) as K.H.'s conservator. Shortly thereafter, K.H. moved to Seward where he resided at Seward Life Action Council (SLAC). K.H. had difficulties with at least one staff member at SLAC, so in 1995 CAPA assisted in transferring him to Fairbanks, where he was placed under the care of Monta Faye Lane of the Interior Caregivers Association. Although K.H. had $90,241 in a securities account at the beginning of the CAPA conservatorship in 1992, that money was gone when he arrived in Fairbanks in 1995.

While at Lane's assisted living home, K.H. intentionally cut his left wrist. In order to provide better supervision and care for K.H., CAPA, already his conservator, was appointed temporary guardian in February 1996. CAPA's guardianship appointment was finalized on July 10, 1996. Soon thereafter, two members of CAPA, Michael Schade and B. Jarvi, formed their own company, Professional Guardian Services Corporation (PGSC). Accordingly, Lane petitioned the superior court to terminate CAPA as guardian and transfer K.H.'s guardianship to PGSC so that K.H. could continue to receive services from the same people. On November 12, 1996, the court ordered the transfer of the conservatorship and guardianship to PGSC.

In December 1996 a standing master for the superior court ordered the court visitor to report on CAPA's expenditures of K.H.'s assets. The report, filed with the court in February 1997, expressed concern that CAPA's billings presented a "disturbing breakdown" of costs, and stated that some fees charged were "unheard of." The court visitor concluded her report by stating that "CAPA spent a large sum of [K.H.'s] money in a 'spend down' fashion rather than using it in a frugal and conscientious way." In a follow-up report, the court visitor concluded that CAPA had "purchased mental health support services for [K.H.] at a rate 1500% higher than was necessary." The court visitor suggested that it was time for an attorney to explore recovery of K.H.'s assets. She expressed doubts about whether Schade was in a position to do that, as he had been Executive Director of CAPA while it served

as K.H.'s conservator and he now served as K.H.'s conservator at PGSC. The court visitor's concerns about Schade's possible conflict of interest were heightened when she learned that Schade had stated in his May 13, 1997 objection to the master's recommendation that "it would not be in [K.H.'s] best interest to get a recovery...."

In February 1997, after the conservatorship and guardianship had been transferred to PGSC, CAPA filed a document entitled "final guardianship report" regarding K.H. However, this report apparently contained a number of errors and inconsistencies, and CAPA submitted an amended report on May 9, 1997.

At the request of PGSC, Sandra Bolling of the Department of Veterans Affairs conducted a field examination and interview with K.H. in April 1997. She recommended that because PGSC was K.H.'s guardian and conservator, it should be appointed his legal custodian for VA purposes. PGSC signed a VA "fiduciary agreement" naming itself as legal custodian and fiduciary for K.H.

Because of continuing concerns that PGSC and CAPA had not fulfilled their duties as guardians and conservators, and that K.H.'s estate was subject to waste, the superior court ordered on July 8, 1997 that the Office of Public Advocacy (OPA) intervene. OPA is K.H.'s current guardian and conservator.

In August 1997 PGSC filed a request with the superior court for approval to pay itself more than $3,000 in conservatorship fees from K.H.'s VA benefits. The request stated that "[t]he VA has authorized [K.H.'s] guardianship/conservatorship fees to be taken from the VA pension funds." In September 1997 the superior court issued an order allowing PGSC to pay its fees from K.H.'s assets "as authorized by the Veterans Administration." The following month, PGSC submitted a "final guardianship/conservatorship report." On behalf of K.H., OPA requested a hearing to clarify the discrepancies between the court order allowing fees and PGSC's purported final report. An evidentiary hearing was held on December 17, 1997, at which it was revealed that PGSC and Schade still controlled K.H.'s VA benefits.

In February 1998, after OPA had been appointed guardian, the court visitor closed her investigation into K.H.'s case. In her "notice of closed case and further concern," she remarked that she had additional concerns about CAPA's billing of K.H. for "vague charges for 'case management' services not otherwise detailed; ... transaction charges not consistent with the fee schedule(s) in effect"; improper travel charges; and "duplicated charges (more than one staff charging for the same service)."

In May 1998 PGSC filed a "federal fiduciary's account" with the Department of Veterans Affairs, covering the period from November 1, 1996 to March 31, 1998. It revealed that PGSC paid itself $3,672.01 in guardianship fees from the veterans benefits. Responsibilities for K.H.'s veterans benefits were apparently not transferred from PGSC to OPA until sometime in March 1998.[2] At this time, the Department of Veterans Affairs conducted a second field examination, but the payee was now listed as OPA rather than PGSC. In her report, the field examiner addressed Schade's handling of K.H.'s VA benefits. She reported that, while Schade had asserted to the superior court that "the VA has authorized [K.H.'s] guardianship/conservatorship fees to be taken from the VA funds," the field examiner had discovered no evidence of any such authorization and thought it extremely unlikely that such an authorization had been given. She added that PGSC signed a VA form that did not allow for fee payment. She concluded by stating, "I find it is highly likely that Mr. Schade made a false or misleading statement to the [s]uperior court. I find that VA funds have been misused. I suspect there is a high possibility of fraud in this case."

### B. Procedural History

On March 18, 1999, OPA filed a complaint on behalf of K.H. to recover money overcharged by CAPA and PGSC.[3] It alleged that CAPA breached its fiduciary duty by charging excessive fees, diverting K.H.'s assets to SLAC, and paying itself fees without written order of the court. K.H. further asserted that PGSC and Schade committed fraud and misrepresentation by telling the court that the VA had authorized them to take fees from VA pension funds. This, K.H. alleges, resulted in the conversion of $5,020.87 of his VA benefits.

PGSC filed a motion for summary judgment, arguing that res judicata barred K.H.'s fraud and misrepresentation claims. PGSC and Schade claimed that this cause of action was litigated and decided by the September 1997 court order that permitted PGSC to pay itself fees "as authorized by the Veterans Administration." The superior court denied the motion on the basis that neither the doctrine of res judicata nor Alaska Civil Rule 60(b) precluded a claim that a prior judgment was obtained by fraud or misrepresentation.

PGSC filed a motion for reconsideration of the denial of summary judgment, arguing that the savings clause in Rule 60(b) was used only in rare and unusual circumstances not present in this case. The allegations in this case, PGSC argued, amounted only to common law fraud, taking the case out of the realm of fraud upon the court. The superior court denied the motion for reconsideration without comment.

CAPA moved for summary judgment based on its assertion that the statute of limitations had expired. It argued that the court visitor's report constituted a final account for the purposes of AS 13.36.100, and that since K.H.'s claim was not filed within six months of that report, it was time barred. K.H. responded that since no final accounting had ever been submitted, the motion should be denied. PGSC joined in CAPA's motion for summary judgment based on the statute of limitations. The superior court granted the motion for summary judgment and dismissed all claims against PGSC, David Schade, and CAPA.

2. Although OPA had replaced PGSC as guardian and conservator on July 8, 1997, and PGSC filed a "final guardianship report" dated October 30, 1997, PGSC retained control of K.H.'s VA benefits.

3. The complaint against CAPA also names their bonding agency, Continental Insurance.

K.H. appeals the grant of summary judgment in favor of PGSC, Schade, and CAPA. PGSC cross-appeals the denial of summary judgment based on res judicata.

## III. STANDARD OF REVIEW

We review a grant of summary judgment de novo and view the facts in the light most favorable to the non-moving party.[4] When reviewing a grant of summary judgment, we must determine whether any genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law.[5] Summary judgment may be affirmed on grounds other than those relied upon by the superior court.[6]

## IV. DISCUSSION

### A. The Statute of Limitations Does Not Bar K.H.'s Claim Because Neither CAPA Nor PGSC Filed a Final Report Fully Disclosing All Financial Matters.

The crux of the dispute before us is whether CAPA or PGSC filed a "final accounting or other statement fully disclosing the matter" sufficient to trigger the six-month limitations period. Alaska Statute 13.36.100 [7] provides for a limitations period of six months after receipt of a final account that fully discloses all pertinent matters upon termination of the trust relationship:

> Unless previously barred by adjudication, consent or limitation, any claim against a trustee for breach of trust is barred as to any beneficiary who has received a final account or other statement fully disclosing the matter and showing termination of the trust relationship between the trustee and the beneficiary unless a proceeding to assert the claim is commenced within six months after the receipt of the final account or statement.

Even if a trustee's final account or statement does not amount to a full disclosure, the beneficiary must file suit within three years of receipt of the final account or other statement as long as the trustee has made all records available for examination by the beneficiary:

> In any event and notwithstanding lack of full disclosure, a trustee who has issued a final account or statement received by the beneficiary and has informed the beneficiary of the location and availability of records for examination by the beneficiary is protected after three years.[8]

Because K.H.'s relationships with CAPA and PGSC spanned different periods, we will address the statute of limitations issue separately for each defendant.

### 1. Community Advocacy Project of Alaska

CAPA served as conservator for K.H. from September 1992 to November 1996. CAPA served as guardian for K.H. from February 1996 to November 1996. The court visitor filed her first report on May 24, 1996, and, on December 10, 1996, the standing master issued a second order appointing the same court visitor to review prior expenditures made on behalf of K.H. That report, filed on February 17, 1997, examined CAPA's expenditures for K.H. and concluded that it presented a "disturbing breakdown." For example, the court visitor expressed concerns that CAPA paid SLAC $54,759 for "services," while at the same time paying itself $27,437 under a category entitled "other." In just one year, CAPA paid SLAC almost $22,000, or $80 per hour, for non-professional services such as training K.H. to do his laundry. The court visitor reported that the fees charged for such services were "unheard of," and pointed out that K.H. was being charged for these services while he was already paying for twenty-four-hour assisted living. She also noted that CAPA's billing statements for

---

**4.** *Nichols,* 6 P.3d at 303.

**5.** *R.E. v. State,* 878 P.2d 1341, 1345 (Alaska 1994); *see also* Alaska R. Civ. P. 56(c).

**6.** *Hernandez v. Lambert,* 951 P.2d 436, 439 n. 5 (Alaska 1998) (citing *James v. McCombs,* 936 P.2d 520, 523 n. 2 (Alaska 1997)).

**7.** Both parties agree that this is the applicable statute of limitations.

**8.** AS 13.36.100.

its services during this period were not specific, "usually indicating only 'guardianship services' or 'conservatorship services' without breaking down the nature of assistance and cost per hour." The court visitor concluded her report by observing that CAPA had dissipated large sums of K.H.'s money "in a 'spend down' fashion rather than using it in a frugal and conscientious way."

In her follow-up report, issued on February 27, 1997, the court visitor reported her discovery that K.H. should have been charged $5 per hour for the services he received at SLAC. In the court visitor's view, the securities account where K.H.'s money was held should not have been touched and interest income on those securities should only have been used if it was distributed to K.H. The visitor concluded that CAPA "purchased mental health support for [K.H.] at a rate 1500% higher than was necessary."

On February 26, 1997, the day before the visitor's follow-up report was filed, CAPA filed a document entitled "final guardianship report" in the superior court. That report was challenged by K.H.'s then-guardian and conservator, PGSC, which requested that the report be rejected because it contained numerous errors. CAPA subsequently filed an "amended final report" in the superior court on May 9, 1997.

CAPA does not point to its own "amended final report" as the accounting that triggers the six-month statute of limitations; rather, CAPA claims that the February 27, 1997 *court visitor's report* constitutes a "final account or other statement fully disclosing the matter" within AS 13.36.100 and that K.H. had six months from that report to file a claim. Because suit was not filed until March 18, 1999, more than eighteen months after the six-month limitation, CAPA argues that it is time barred. To support its argument, CAPA points out that in his complaint, K.H. simply reiterated the allegations made by the court visitor in her February 27, 1997 report and addendum. CAPA adds that K.H. offered no evidence that he had learned of any additional facts regarding CAPA's performance as conservator between February 27, 1997, the date of the visitor's report

and addendum, and March 18, 1999, the date the lawsuit was filed.

However, CAPA's argument that the February 27, 1997 court visitor's report constitutes "a final account or other statement fully disclosing the matter" under AS 13.36.100, thus triggering the six-month limitations period, is not convincing. The statute contemplates that the final account or statement triggering the statute of limitations must be submitted by the trustee. Indeed, the statutory provision explicitly provides in its second sentence that "*a trustee* who has issued a final account or statement" is protected after three years provided that the trustee has informed the beneficiary of the location and availability of information. (Emphasis added.) It is the trustee, not a third person such as a court visitor, who must issue the final account or other statement fully disclosing the matter in order to trigger the applicable statute of limitations. The trustee is the party with the knowledge, access, and information available to make a "full disclosure" under the statute and is therefore the party who is required to provide a full and final account.

CAPA was apparently aware that it was required to file the final account, as it filed two "final guardianship report" forms in the superior court. These forms provide a special section for the final accounting. CAPA filed its amended "final guardianship" report on May 9, 1997, after the court visitor's February 27, 1997 addendum and report. This undercuts CAPA's contention that the visitor's report constitutes a "statement fully disclosing the matter"; CAPA was still working on its own accounting in the K.H. conservatorship almost three months after the court visitor's report.

Finally, CAPA does not argue that its own "final guardianship" report is the triggering event for the six-month statute of limitations. This report could not be viewed as providing "full disclosure," particularly when Schade, who was director of CAPA while it served as K.H.'s guardian, called the report "incomplete." Indeed, CAPA's counsel submitted an affidavit to the trial court in September 2000, stating that he had learned that SLAC overcharged K.H.: "My review of [the SLAC

fee payment policy] and [K.H.'s] circumstances supports a good faith argument that SLAC's charges to [K.H.] in 1992 and 1993 violated the SLAC contract with [K.H.]." Thus, new facts have come to light during the course of this litigation which indicate that CAPA's own report is not a "statement fully disclosing the matter" which would trigger the six-month limit.

CAPA's suggestion that the six-month limitations period is triggered here because the subsequent conservator may have been aware of alleged misconduct is also unavailing. The statute requires more than just inquiry notice. Rather, the statute specifically provides that the six-month limitations period begins to run only after the ward or beneficiary receives a statement by the trustee that provides full disclosure of all financial matters. In the absence of full disclosure, the three-year limitations period is available.

Because the trustee failed to issue a final report making full disclosure under AS 13.36.100, the six-month limit was not triggered. The court visitor's report cannot satisfy the statute's requirement that the trustee issue the report. Therefore, the trial court erred in granting summary judgment in favor of CAPA on statute of limitations grounds.

### 2. Professional Guardian Services Corporation and David Schade

■ PGSC served as guardian and conservator for K.H. from November 12, 1996 to July 8, 1997. The court visitor filed one report in K.H.'s case while PGSC was guardian and conservator. In that report, she reiterated the questionable and excessive expenditures made by CAPA. She also concluded that since Schade was director of CAPA at the time, and now served as K.H.'s guardian at PGSC, there was a possible conflict of interest, particularly given Schade's apparent reluctance to sue to recover K.H.'s assets. As a result, the superior court removed PGSC and appointed OPA to serve as K.H.'s guardian and conservator.

PGSC immediately filed a motion for approval of payment of guardianship and conservatorship fees, announcing that "[t]he VA has authorized [K.H.'s] guardianship/conser-

vatorship fees to be taken from the VA pension funds." On September 9, 1997, the court issued an order allowing PGSC to take its fees "as authorized by the Veterans Administration." PGSC filed a three-page "final guardianship/conservatorship report" in the superior court on October 30, 1997. K.H. objected to the report, arguing that the VA funds taken pursuant to the September 9, 1997 order were not included in PGSC's October 30 final report and requested a hearing. During the hearing, held on December 17, 1997, Schade did not substantiate his claim of authorization to use VA benefits to pay his fees. Moreover, OPA was unable to obtain PGSC's fiduciary agreement with the VA until March 1998. OPA claims that it did not receive PGSC's federal fiduciary account statement until June 30, 1998.

K.H. contends that the trial court erred in granting summary judgment to PGSC because, like CAPA, PGSC failed to file a final accounting or other statement fully disclosing all financial matters of the guardianship and conservatorship. K.H. points out that after PGSC filed a final report on October 30, 1997, K.H. objected, and a hearing was held. The standing master asked for further reporting. There was never a follow-up or amended report. In addition, K.H. argues that a VA inquiry into the expenditure of funds was still ongoing in 1998.

PGSC and Schade maintain that there is no question that the October 30, 1997 final report constitutes a final accounting of activities conducted on behalf of K.H., thus triggering the six-month limit. PGSC argues that K.H. has previously acknowledged the report as a final accounting and that the six-month limit began to run on October 30, 1997, the date the report was filed. PGSC also argues that at the December 17, 1997 hearing it disclosed the VA as the source of fees it was receiving and that Schade answered any questions regarding those fees. PGSC adds that "[t]here is no indication that any information was withheld from the final accounting." Thus, PGSC argues, there was no lack of disclosure which would extend the limit from six months to three years.

Alaska Statute 13.36.100 requires full disclosure of all financial matters upon "termi-

nation of the trust relationship between the trustee and the beneficiary." Here, PGSC's October 30, 1997 final report failed to explain the $3,329 in fees it paid itself out of K.H.'s VA funds. Schade did not reveal that he was still receiving K.H.'s VA checks until the December 17, 1997 hearing. Moreover, OPA did not receive PGSC's fiduciary agreement with the VA until March 1998 and was apparently unable to obtain PGSC's federal fiduciary account statement until June 30, 1998. None of this information was included in the final accounting. The final report thus could not constitute full disclosure. Moreover, OPA does not appear to have taken over for PGSC as VA fiduciary until March 1998. While K.H. may have been made aware that PGSC was paying itself with his fees in September of 1997, it took almost six more months to obtain a copy of PGSC's fiduciary agreement and have a VA examiner determine if and when PGSC received the alleged authorization to take their fees from K.H.'s VA benefits. Thus, not only did PGSC fail to include in its final report the fact that it continued to receive K.H.'s VA benefit checks, it also apparently continued in its capacity as fiduciary for K.H.'s VA benefits well into 1998—at least six months after filing the alleged final report. Thus, the trust relationship between K.H. and PGSC had not terminated at the time the final report was filed.

Therefore, the trial court erred in granting summary judgment to PGSC on statute of limitations grounds. PGSC's final report failed to make a full disclosure in its omission of the fact that it was still receiving K.H.'s VA benefits, and the relationship between K.H. and PGSC continued beyond the date of the final report.

### B. K.H.'s Claim Against PGSC Is Not Barred by Res Judicata.

■ PGSC appeals the denial of the motion for summary judgment based on res judicata. PGSC argues that K.H. is in effect trying to relitigate the September 1997 court order awarding PGSC $3,020.97 for conservatorship fees. The present action to recover those fees, PGSC contends, involves the same parties and the same issue and is therefore barred by res judicata. PGSC maintains that if K.H. thought the fee award was obtained improperly, he had one year to challenge the order under Civil Rule 60(b).[9] However, Rule 60(b) contains a savings clause which permits the court to set aside a judgment for "fraud upon the court":

> This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order or proceeding, or to grant relief to a defendant not personally served, or to set aside a judgment for fraud upon the court.

PGSC asserts that the savings clause in Rule 60(b) is only to be employed "in extraordinary circumstances, such as when a fraud on the court would result in manifest injustice." Thus, PGSC maintains that because K.H.'s allegations would only amount to common law fraud, he is not entitled to take advantage of the savings clause and his present claim should have been dismissed.

■ We need not reach the issue of whether PGSC's conduct amounted to fraud upon the court because we conclude that the September 1997 order approving fees was not a final judgment for purposes of res judicata. Res judicata is a judicial doctrine that prevents the relitigation of the same claim between the same parties or those in privity with them.[10] However, only a valid, final judgment on the merits presents an absolute bar to a subsequent action.[11] The September 1997 order allowing PGSC to take fees from K.H.'s VA benefits was an interim order not appealable under Appellate Rule 202.[12] It does not constitute a valid, final

---

**9.** Civil Rule 60(b) provides in part:

The motion shall be made within a reasonable time, and for ... [fraud or misrepresentation] not more than one year after the date of the notice of the judgment or orders as defined in Civil Rule 58.1(c).

**10.** *Calhoun v. Greening*, 636 P.2d 69, 71–72 (Alaska 1981).

**11.** *Id.*

**12.** Appellate Rule 202 provides in part:

judgment on the merits and thus res judicata does not apply. The superior court's ruling in favor of K.H. on the issue of res judicata is affirmed.

## V. CONCLUSION

Neither CAPA nor PGSC filed final accountings which fully disclosed K.H.'s financial matters. Summary judgment as to both is REVERSED and this case is REMANDED for further proceedings in accordance with this opinion.

The court order that authorized PGSC and Schade to pay itself from K.H.'s VA benefits was not a final judgment for purposes of res judicata. The denial of summary judgment based on res judicata is AFFIRMED.

(a) An appeal may be taken to the supreme court from a final judgment entered by the superior court, in the circumstances specified in AS 22.05.010.