**Susan TRAPP, Appellant,**

v.

**STATE of Alaska, OFFICE OF PUBLIC ADVOCACY, Appellee.**

**No. S–11280.**

Supreme Court of Alaska.

May 13, 2005.

---

John A. Treptow, Wendy E. Leukuma, Dorsey & Whitney LLP, Anchorage, for Appellant.

Venable Vermont, Jr., Assistant Attorney General, Anchorage, Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

## I. INTRODUCTION

Under Alaska law, an individual may petition the superior court to appoint a conservator with power to manage the individual's finances, or a guardian with a broader, quasi-parental power to promote the individual's well-being. In cases where no private person is willing and competent to serve, the state Office of Public Advocacy (OPA) is appointed as a conservator or guardian. OPA was appointed to be Susan Trapp's conservator in 1995, pursuant to Trapp's petition. Before and during OPA's conservatorship, Trapp was addicted to drugs and alcohol, was physically and mentally ill, and was sometimes homeless. The main question in this appeal is whether OPA, knowing Trapp's problems, had a duty to seek to convert the conservatorship into a guardianship. We hold that OPA had no such duty, and affirm the judgment of the superior court. Trapp also argues OPA should have made a "report of harm" to the Department of Health and Social Services (DHSS), but we do not consider this argument on the merits because Trapp entered a stipulation dismissing her duty-to-report claim.

## II. FACTS AND PROCEEDINGS

Because the superior court decided the case in OPA's favor on summary judgment motions, we will present the facts in the light most favorable to Trapp.[1] In 1995 Trapp petitioned the superior court to appoint a conservator for herself. After a hearing, the superior court entered an order appointing OPA as conservator "with the powers and duties set forth in AS 13.26.280 and as set out in the conservatorship plan." As discussed in more detail below, AS 13.26.280 authorizes conservators to undertake, without court authorization, twenty-five acts related to management of the protected person's property; the conservatorship plan can also authorize additional acts. Here the conservatorship plan approved by the superior court was routine; it authorized OPA to collect funds, pay certain living expenses, and manage Trapp's property.[2]

Even before OPA had been appointed as Trapp's conservator, Trapp had a history of drug and alcohol abuse, physical and mental illness, and homelessness. These problems continued through the conservatorship, with Trapp spending significant amounts of time homeless or without a permanent home, in jail, or in the Alaska Psychiatric Institute (API). According to a May 2003 statement by Trapp's treating physician, "[o]ver the past many years, in addition to 51 admissions to API, the patient has been at Clitheroe Detox Program 48 times, has been convicted of misdemeanor offenses about 40 times, and over the past several years has been seen at the Providence Anchorage emergency room about 200 times." The OPA employee assigned to Trapp's case knew about these problems.

Trapp's grievances against OPA have evolved somewhat over time. Initially Trapp asked the superior court to terminate the conservatorship; these requests were denied,

---

1. *State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs. v. Sandsness*, 72 P.3d 299, 301 (Alaska 2003).

2. The conservatorship plan stated:
   1. The conservator [OPA] has full authority to pay for the ward's medical care, mental health treatment, and any necessary physical and mental examinations.
   2. The conservator has full authority to pay for the ward's housing in the least restrictive setting feasible.
   3. The conservator has full authority to pay for the ward's personal care, comfort, maintenance, education and vocational services nec-

essary for the physical and mental welfare of the ward.
   4. The conservator has full authority to obtain health and accident insurance and to apply for and collect any other private or governmental benefits to which the ward may be entitled, to meet any part of the costs of medical, mental health or related services provided to the ward.
   5. The conservator has full authority to handle financial affairs and receive money and property deliverable to the ward, including full control of the estate and the income of the ward to pay for the cost of services.

although once the superior court ordered OPA and Trapp to agree on a schedule to increase Trapp's control over her property. In April 2000 Trapp filed a civil complaint against OPA. The complaint alleged that OPA intentionally withheld funds from her, told other agencies not to provide her with help, verbally abused Trapp, and failed to act on its knowledge of the severity of her illnesses and homelessness. The superior court granted OPA's motion to dismiss Trapp's suit based on absolute quasi-judicial immunity, but we reversed this on Trapp's appeal.[3]

On remand Trapp filed an amended complaint, this time with the assistance of counsel. The thrust of the amended complaint was that OPA should have assumed more (not less) control over Trapp's life. The amended complaint alleged, among other claims, that "OPA breached its fiduciary duty to [Trapp] by failing to take formal action to address [Trapp's] psychiatric disorders, severe drug and alcohol addictions, and gambling addiction." OPA moved for partial summary judgment. OPA argued that it had no duty to seek to "upgrade Trapp's conservatorship to a guardianship and to take more power over her life and affairs." Trapp opposed OPA's motion, and simultaneously moved for partial summary judgment in her favor. In the papers opposing OPA's motion and supporting her own, Trapp argued that OPA owed her a duty to petition for guardianship, and also referred vaguely to OPA's duty to take other "affirmative steps" to care for Trapp. Later, in her reply papers in support of her motion (i.e., after OPA's motion was fully briefed), Trapp made this latter argument more specific, by claiming that OPA had breached AS 47.24.010(a)(5). This statutory provision requires conservators and guardians to report to DHSS all cases in which it believes "vulnerable adults" are suffering from "self-neglect" or other problems.[4]

In an order dated September 11, 2003, Superior Court Judge Peter A. Michalski granted OPA's motion for partial summary judgment, on the ground that "there is no such duty [to seek guardianship] under these facts." Trapp filed a motion to amend this order, to "clarify" that Trapp's motion for partial summary judgment had been denied. According to this motion to amend, Trapp's partial summary judgment motion had contended that "OPA owed [Trapp] an affirmative duty to either petition for a guardianship or to take affirmative steps to protect her health and safety...." On September 24 Judge Michalski duly amended his order to state that Trapp's "cross-motion for partial summary judgment is hereby denied." Trapp then moved to have the amended order entered as a judgment, notwithstanding the pendency of other claims in Trapp's amended complaint that were not included in either partial summary judgment motion. Judge Michalski agreed, and entered the following judgment under Civil Rule 54(b): "IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Office of Public Advocacy did not owe a duty to the plaintiff to upgrade plaintiff's conservatorship to a guardianship or to take affirmative action to protect plaintiff when plaintiff was unable to take care of herself."

Trapp appealed. After hearing oral argument, we dismissed the appeal on the ground that the superior court should not have entered the judgment until it had adjudicated all claims in the amended complaint. Our order stated that the dismissal of the appeal would be rescinded if "the parties file a formal stipulation within ten days from the

---

3. We held that OPA was not entitled to absolute immunity but expressed no opinion on whether OPA might be entitled to "qualified public official immunity." *Trapp v. State, Office of Pub. Advocacy*, 53 P.3d 1128, 1130 n. 4 (Alaska 2002).

4. "[T]he following persons [including guardians and conservators] who ... have reasonable cause to believe that a vulnerable adult suffers from abandonment, exploitation, abuse, neglect, or self-neglect shall ... report the belief to the department's central information and referral service for vulnerable adults." AS 47.24.010(a).

After receiving such a report, DHSS may petition the superior court for appointment of a guardian, and also is required—if the vulnerable adult or the adult's guardian consents—to ensure that any necessary protective services are provided to the vulnerable adult. *See* AS 47.24.017 (requiring department to ensure provision of any protective services it determines to be necessary, provided vulnerable adult consents to receipt of services); AS 47.24.019(a) (department "may petition" for appointment of guardian).

date of this order that provides that all claims not encompassed within the superior court's grant of OPA's Motion for Partial Summary Judgment are dismissed with prejudice." The parties timely filed this stipulation, thereby authorizing us to hear the appeal.

## III. DISCUSSION

Trapp argues that OPA, as Trapp's conservator, is liable in tort because (1) OPA breached a common-law duty of care by failing to seek to become Trapp's guardian, and (2) OPA breached its statutory duty to make a report of harm to DHSS.

### A. OPA's Purported Duty To Petition To Become Trapp's Guardian

■ Trapp's main argument is that common-law principles give her a tort remedy against OPA for failing to petition to become her guardian. It is undisputed that as a guardian, OPA would have exerted significantly more control over Trapp's life than it did as her conservator, a guardian having (for example) most of the same powers and responsibilities over a ward that parents have over their unemancipated child.[5] The scope of a tort duty, unless it turns on disputed facts (and here it does not), is a question of law that we review de novo.[6]

The general rule is that a person is not required to act to protect another, but there are exceptions.[7] Here the most relevant exception is in section 323 of the Restatement (Second) of Torts, which makes actors liable for failing to perform a prior "undertaking" with reasonable care:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure

to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

This principle underlies several of our decisions.[8]

Trapp argues that the conservatorship plan, the OPA statute, and the conservatorship statute amount to an "undertaking" by OPA to protect Trapp from herself, to the extent of requiring OPA to petition to become Trapp's guardian. The plan certainly does not do this; it merely gives OPA routine financial responsibilities. Trapp relies on the plan's use of the term "ward," which might imply a guardianship rather than a conservatorship, but read in context we think this was at most a trivial solecism.

Trapp also argues that the conservatorship statute and the statute regulating OPA amount to the requisite "undertaking" by OPA. Trapp focuses on three statutory provisions. Under the first, OPA is required to make quarterly visits to "monitor [the] welfare" of persons for whom it is a guardian or conservator.[9] But OPA's duty to "visit" or "monitor" a protected person is not the same as a duty to take concrete steps to promote the person's welfare. And even promoting the protected person's "welfare" might mean only that the conservator should ensure that money spent to educate or support the protected person is spent wisely.

Trapp also cites a provision, applicable only to OPA and not to other conservators, requiring OPA to intervene in conservatorship proceedings in cases where intervention is in the "best interests" of the protected person.[10] For this provision to constitute an "undertaking" in the sense described above, Trapp would have to read the provision to require OPA to seek to convert conservatorships into guardianships, or at least to re-

5. *See* AS 13.26.150(c) (duties of guardian over incapacitated adult).

6. *See, e.g., Henricksen v. State,* 319 Mont. 307, 84 P.3d 38, 45 (2004); *Sanchez v. State,* 99 N.Y.2d 247, 754 N.Y.S.2d 621, 784 N.E.2d 675, 678 (2002).

7. *Joseph v. State,* 26 P.3d 459, 473 (Alaska 2001).

8. *See, e.g., R.E. v. State,* 878 P.2d 1341 (Alaska 1994); *Adams v. State,* 555 P.2d 235 (Alaska 1976).

9. AS 13.26.380(c)(2).

10. AS 13.26.390(4).

quire OPA to urge some kind of outcome in the course of its intervention. But this reading is somewhat implausible. What OPA may choose to do once it has intervened is not specified, and the purpose of the statute seems rather to authorize interventions by OPA to replace incompetent or corrupt private conservators.[11] In any event, the statute gives OPA authority to intervene but does not require it; it is hard to see how such an authorization could amount to an "undertaking" to act.

Trapp's third statutory argument is based on AS 47.24.010(a), which directs conservators to make a report of harm to DHSS whenever they come across a "vulnerable adult." OPA apparently did not make this report of harm, and Trapp argues mainly that OPA should be civilly liable to her for breach of this statutory duty, irrespective of whether OPA had a duty to seek to become her guardian. This argument is considered in the next section. But we also think it is fair to consider whether the duty to report could amount to an undertaking by OPA to petition to become Trapp's guardian.

We conclude that the duty-to-report provision does not amount to such an undertaking. It says that where conservators (and others in a long list of social services providers) "have reasonable cause to believe that a vulnerable adult suffers from abandonment, exploitation, abuse, neglect, or self-neglect," the conservator "shall . . . report the belief to [DHSS's] central information and referral service for vulnerable adults."[12] A report triggers an investigation by DHSS's Adult Protective Services (APS) office.[13] After investigating, APS "may" petition the superior court for appointment of a guardian, and also is required, if the vulnerable adult or the adult's guardian consents, to ensure that any necessary protective services are provided to the vulnerable adult.[14] These provisions arguably require OPA and other conservators to make a report of harm, and anticipate that APS may act on that report by seeking to have a guardian appointed. But they do not require the conservator to make the guardianship petition itself. We therefore think that AS 47.24.010(a) does not amount to an undertaking by OPA or other conservators to petition to become Trapp's guardian.

Moreover, other statutory provisions make it clear that OPA's primary role in a conservatorship is to manage the protected person's property for the person's benefit, rather than to assume responsibility for the person's welfare. This emphasis on money does not preclude the possibility that other statutory provisions impose non-financial duties, but it does suggest another reason why we should not read broadly worded provisions in the way that Trapp wants us to. For example, AS 13.26.280 and AS 13.26.285 enumerate the actions a conservator is authorized to take. These relate exclusively to the protected person's property.[15] One ex-

11. AS 13.26.390 provides:
    The public guardian may, on the public guardian's own motion or at the request of the court, intervene in a guardianship or conservatorship proceeding if the public guardian or the court considers the intervention to be justified because
    (1) an appointed guardian or conservator is not fulfilling duties;
    (2) the estate is subject to waste as a result of the costs of the guardianship or conservatorship;
    (3) a willing and qualified guardian or conservator is not available; or
    (4) the best interests of the ward, respondent, protected person, or person who is the subject of a conservatorship proceeding require the intervention.

12. AS 47.24.010(a) & (a)(5).

13. AS 47.24.015(a).

14. *See* AS 47.24.017 (requiring department to ensure provision of any protective services it determines to be necessary, provided vulnerable adult consents to receipt of services); AS 47.24.019(a) (department "may petition" for appointment of guardian).

15. AS 13.26.280 provides:
    (a) A conservator has all of the powers conferred herein and any additional powers conferred by law on trustees in this state. In addition, a conservator of the estate of an unmarried minor, as to whom no one has parental rights, has the duties and powers of a guardian of a minor described in AS 13.26.070 until the minor attains the age of 18 or marries, but the parental rights so conferred on a conservator do not preclude appointment of a guardian as provided by AS 13.26.030— 13.26.085.

ception is that AS 13.26.280(a) gives conservators the powers of a guardian in cases where the protected person is a minor, but the specificity of the exception suggests that conservators do *not* have a general responsibility over protected adults such as Trapp.[16] Subsection .280(a) also gives conservators, in addition to their specifically listed powers, "any additional powers conferred by law on trustees in this state." But trustees are traditionally responsible for property, not persons, and there is no authority we know of that would make a trustee directly responsible for the personal welfare of a beneficiary.[17] Another section of the conservatorship statute makes conservators liable for torts "committed in the administration of the estate."[18] Although we do not read this section as necessarily providing the exclusive redress against any potentially tortious acts by OPA, it again suggests that it would be surprising if the same statute elsewhere created an undertaking by OPA to look after Trapp's person.

Trapp also cites a number of cases to support her argument that OPA has, merely by virtue of becoming her conservator, undertaken to petition to become her guardian, but we find these distinguishable. In each case the defendant failed in tasks at the heart of its statutory or traditional responsibilities: police officers in their duty to respond to specific threats; jailers in their duty to look after the welfare of their prisoners; fire inspectors in their duty to act on knowledge of fire hazards in a building; child protection agencies in their duty to inspect and license daycare centers.[19] These cases do not support what Trapp advocates, which is to expand the scope of a conservator's duties beyond the duties imposed by detailed statutes.

█ Trapp also argues that, even if there is no undertaking sufficient to impose a duty under the Restatement, the policy factors listed in *D.S.W. v. Fairbanks North Star Borough School District* support expanding the scope of OPA's duty to Trapp.[20] Even assuming that considering these factors is proper in a situation where Restatement principles suggest there should not be a duty,[21] the humanitarian merit of Trapp's

(b) A conservator has power without court authorization or confirmation, to invest and reinvest funds of the estate as would a trustee.

(c) A conservator, acting reasonably in efforts to accomplish the purpose for which the conservator was appointed, may act, without court authorization or confirmation, to

(1) collect, hold and retain assets of the estate including land in another state, until, in the conservator's judgment, disposition of the assets should be made, and the assets may be retained even though they include an asset in which the conservator is personally interested[.]

The statute goes on to list twenty-four other powers to manage the protected person's property. *See also First Nat'l Bank of Anchorage v. State, Office of Pub. Advocacy*, 902 P.2d 330, 331 n. 1 (Alaska 1995) ("The conservatorship statute authorizes a conservator to handle a ward's financial affairs.").

16. One "useful and logical" maxim of statutory construction, though it should not be blindly followed, is *expressio unis est exclusio alterius*, which means that to express one thing is to imply the exclusion of others. *See Ellingstad v. State, Dep't of Natural Res.*, 979 P.2d 1000, 1006 (Alaska 1999).

17. *See, e.g.*, AS 13.36.109 ("a trustee may perform all actions necessary to accomplish the proper management, investment, and distribu-

tion of the trust property," enumerating specific property-management duties that trustees have); RESTATEMENT (SECOND) OF TRUSTS §§ 164–196 (1959) (similar).

18. AS 13.26.305(b).

19. *City of Kotzebue v. McLean*, 702 P.2d 1309, 1312–13 (Alaska 1985) (police); *Joseph*, 26 P.3d at 473–74 (jailer); *Adams*, 555 P.2d at 240 (fire inspector); *R.E.*, 878 P.2d at 1346–48 (child protection agency).

20. The *D.S.W.* factors are:

The foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

*D.S.W. v. Fairbanks N. Star Borough Sch. Dist.*, 628 P.2d 554, 555 (Alaska 1981).

21. *Cf. Wongittilin v. State*, 36 P.3d 678, 685 (Alaska 2001) ("Because we hold that the police

position would not outweigh the unfairness and surprise to OPA (and potentially to other conservators) that would result from imposing a vague common-law responsibility beyond those listed in the statutes and the plan. Put into *D.S.W.* terms, we believe there would be a significant "burden to the defendant and consequences to the community" if we imposed an extra-statutory duty of care.

A final consideration is that we are reluctant to alter policy choices embedded in the legislative scheme. As Trapp acknowledges, the conservatorship statute balances the protected person's independence against her need for supervision.[22] If we read that statute or the OPA statute as broadly as Trapp asks us to, it might induce OPA to petition for a guardianship in cases where a guardianship is less obviously merited than it seems to have been in Trapp's case. This result would alter the policy balance enacted by the statute.[23]

At bottom, Trapp's arguments overestimate the latitude courts have to impose a common-law duty. Trapp's view seems to be that a duty can be imposed whenever inaction harms someone and the duty is otherwise (in Trapp's words) "consistent" with a statutory scheme governing the relationship between the parties. But as the foregoing indicates, our willingness to impose such a duty is limited by the general principle against imposing duties to act for the benefit of another. It is also limited by our reluctance to surprise conservators with non-statutory duties, particularly where such duties

would cause conservators to interfere more in the lives of protected persons, a policy choice potentially in conflict with the conservatorship statute. We therefore reject Trapp's argument that OPA should be liable for failing to seek to become her guardian.

### B. OPA's Purported Duty To Report Trapp as a "Vulnerable Adult"

■ Trapp's other argument is that OPA should be liable to her in tort because it failed to make a report of harm under AS 47.24.010(a). As we have noted, this statute says that where conservators (and others in a long list of social services professionals) "have reasonable cause to believe that a vulnerable adult suffers from abandonment, exploitation, abuse, neglect, or self-neglect," the conservator "shall ... report the belief to [DHSS's] central information and referral service for vulnerable adults."[24] This report leads to an investigation by APS, which may petition for appointment of a guardian, and is required to ensure that (where the vulnerable adult or guardian consents) other protective services are provided.[25]

There are serious questions about whether Trapp's duty-to-report claim was preserved in the superior court, and whether Trapp could ever prove that this failure to report proximately caused her injuries. But we do not reach these issues, because we believe the duty-to-report claim is subject to the stipulation of dismissal previously entered in this court.

had no duty to arrest Jackson based on our existing case law, we need not perform a *D.S.W.* factor analysis...."). *See also Joseph*, 26 P.3d at 473 ("Absent [a relationship giving rise to a recognized duty of care], we typically apply the *D.S.W.* factors to decide whether a duty of care exists. But if the parties already have a relationship that gives rise to a recognized duty of care, the focus is instead on what conduct is needed to discharge that duty.") (footnotes and citations omitted).

22. *See, e.g.,* AS 13.26.195(d) ("A conservator may be appointed only if a less restrictive protective order or the services of a special conservator are not adequate to protected the estate of the protected person."); AS 13.26.285(d) (When protected person's disability ends, conservator must pay over all estate funds to former protected person "as soon as possible.").

23. *See State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs. v. Sandsness,* 72 P.3d 299, 303–04 (Alaska 2003) (rejecting claim that state had tort duty to use due care in deciding whether to release juvenile offender; imposing such a duty would make the state reluctant to release juveniles and override statutory compromise between offender's needs and society's needs).

24. AS 47.24.010(a) & (a)(5).

25. *See* AS 47.24.017 (requiring department to ensure provision of any protective services it determines to be necessary, provided vulnerable adult consents to receipt of services); AS 47.24.019(a) (department "may petition" for appointment of guardian).

As entered by the parties, the stipulation dismisses "all claims not encompassed within the superior court's grant of OPA's Motion for Partial Summary Judgment dated September 11, 2003." In this September 11 order granting OPA's motion, the superior court "grant[ed] summary judgment to the defendant on the issue of duty to seek guardianship." There was no mention of the duty-to-report issue. Nor should there have been, since this issue was not raised by OPA in its motion, or by Trapp in her opposition. Instead, the first time anyone raised the duty-to-report issue was in Trapp's reply brief in support of *her* motion for summary judgment, which described the duty to report as one "affirmative action" OPA should have taken as an alternative to seeking to become Trapp's guardian. And Trapp's motion was denied in another, amended order dated September 24, 2003. These facts persuade us that the duty-to-report issue was not, in the words of the stipulation, "encompassed within the superior court's grant of OPA's Motion for Partial Summary Judgment dated September 11, 2003."

For these reasons, we find that the duty-to-report claim was dismissed by stipulation, and that appellate review of this issue is not available.

## IV. CONCLUSION

The order of the superior court granting partial summary judgment to OPA on Trapp's claim that OPA had a duty to seek a guardianship for her is AFFIRMED. All other claims have been previously dismissed by stipulation. It is unnecessary to consider OPA's argument that it is entitled to discretionary function immunity.

