*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DAVID HURN, as parent and next best friend of Minor Children, D.H. and P.H., | ) ) ) ) | Supreme Court No. S-14343 |
| | ) | Superior Court No. 3PA-08-02412 CI |
| Appellant, | ) ) | O P I N I O N |
| v. | ) ) | No. 6749 – February 8, 2013 |
| SIMONE GREENWAY, | ) ) | |
| Appellee. | ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge.

Appearances: Ted Stepovich, Anchorage, for Appellant. Barry J. Kell, Call, Hanson & Kell, P.C., Anchorage, for Appellee.

Before: Carpeneti, Chief Justice, Fabe, Winfree, and Stowers, Justices.

FABE, Justice.

## I. INTRODUCTION

Simone Greenway and her friend Carrie Randall-Evans were dancing together in a suggestive manner and teasing Jeffrey Evans, Carrie's husband, when Jeffrey left the room, returned with a pistol, and shot everyone inside, killing Carrie. He

then shot and killed himself. David Hurn, the father of Carrie's two minor children, sued, claiming that Greenway's participation in the dance was negligent either because it breached her duty as homeowner to control her guests or because it created a foreseeable and unreasonable risk of violence. Greenway moved for summary judgment. Because property owners generally have no duty to control the conduct of third parties in their homes, and because murder was not the foreseeable result of suggestive dancing, we decline to hold Greenway liable.

## II.    FACTS AND PROCEEDINGS

### A.    Facts[1]

Simone Greenway met Carrie Randall-Evans in the summer of 2006 at a mutual friend's house where Carrie was staying because she was afraid of her husband, Jeffrey Evans. The two women took walks together, and Carrie confided in Greenway that Jeffrey scared her and that she was happy to have a job on the Slope so that she could be independent. Carrie confessed to Greenway that she was afraid that Jeffrey would hurt her, that she would never get away, and that Jeffrey might kill her.

Two months later, Greenway met Jeffrey while at a bar with her ex-husband. While at the bar, Jeffrey insulted Carrie, saying she was "no good, and she was a tramp, and he didn't understand why she had her job and he didn't." Jeffrey threatened to "beat the living shit" out of Carrie if she did not send him money, and Greenway felt that Carrie was "a bit threatened by him." Greenway saw Jeffrey on a few more occasions, but did not have an extensive relationship with him and only saw him incidentally when she was with her ex-husband. Greenway said that during these occasions Jeffrey was always "bad-mouthing" Carrie and would threaten "to beat the shit

---

[1]    These facts are taken from the deposition of Simone Greenway. For the purposes of summary judgment, we accept these facts as true and read them in the light most favorable to Hurn.

out of her." But prior to the murder, Greenway had never witnessed Jeffrey become violent or threaten to shoot Carrie.

On the day of the murder, Greenway met with her ex-husband again, who asked her to give Jeffrey a ride home. Jeffrey asked if they could pick up Carrie, who had recently returned from a trip to San Antonio, Texas, and Greenway agreed. While in the car, Carrie showed Jeffrey her necklace and said, "[L]ook what my sugar daddy got me." Greenway immediately looked to Jeffrey because it was a "very uncomfortable situation." Jeffrey's expression was "stone cold." Carrie then asked to go to Greenway's house. Greenway agreed and called her friend, Bill Anthony, who was at the house, and asked him to start preparing some moose meat. Carrie, Greenway, and Jeffrey began drinking, and Anthony went home.

Throughout the evening, Carrie and Jeffrey went to the back bedroom and bathroom alone, and Carrie did not appear afraid. Later, Carrie and Greenway sat at one end of the couch and held hands; Carrie appeared afraid but did not discuss why. Greenway said that Carrie sat next to her "like she wanted [Greenway] to protect her." Jeffrey asked Carrie and Greenway, "[W]hat would you girls do if somebody came in that door right now, after you?" Carrie and Greenway gave each other a high five and said, "[W]e'd kick his ass."

Carrie and Greenway began sparring, and the sparring turned to dancing. While dancing, Greenway and Carrie kissed and touched each other. Greenway acknowledged that they were "laughing and joking and making fun out of [Jeffrey]" and that she was teasing Jeffrey "on purpose," with the intent of punishing him "because he was a jealous man." Greenway said that while she was laughing at Jeffrey she was attempting to express to Carrie the nonverbal message that "you don't have to be afraid. . . . [T]his my domain, you don't have to be afraid here." While being teased, Jeffrey "had no emotion, showed none whatsoever. He was stone cold, no emotion."

Jeffrey left the room and Carrie left for the bathroom. Jeffrey returned with a gun. Greenway did not know that Jeffrey had brought a gun, and she did not keep guns in her home. Jeffrey shot Greenway, who fell to the floor. Anthony, who had rejoined the gathering earlier, entered the room, and Jeffrey shot him five times. Jeffrey went to Greenway, knelt beside her, showed Greenway her car keys in one hand, and shot her again in the chest. Jeffrey then ran after Carrie and shot her three times, including once in the back of the head, killing her. Jeffrey then turned the gun on himself and killed himself. Greenway survived the attack.

## B.    Proceedings

David Hurn, the father of Carrie's two minor children, brought suit on their behalf against Jeffrey Evans's estate and Simone Greenway, seeking damages for Carrie's murder. Jeffrey's estate settled.[2] Regarding Greenway, the complaint alleged that "Greenway was negligent when she made sexual advances towards Carrie Randall-Evans while her husband Jeffrey Evans was in the home" and that "[a]s a direct and proximate result of Simone's negligence, Carrie was shot by Jeffrey Evans." Hurn requested damages on behalf of Carrie's children.

Greenway filed a motion for summary judgment, arguing that she did not cause Carrie's murder and that she owed no duty to prevent Jeffrey from murdering Carrie. The superior court granted the motion, and Hurn appeals that decision.

---

[2]    As a result of settlement, Jeffrey's estate confessed to an $800,000 judgment. The estate did not have any assets from which to pay the judgment.

## III. STANDARD OF REVIEW

We are asked to review a grant of summary judgment and to determine the existence and extent of a duty of care. These are questions of law, which we review de novo.[3]

## IV. DISCUSSION

"In reviewing a grant of summary judgment, this court must determine whether any genuine issue of material fact exists and whether on the established facts the moving party is entitled to judgment as a matter of law."[4] When determining the existence of a duty of care, summary judgment is appropriate where "the only reasonable inference from the undisputed facts is that one party owed another no duty whatsoever — or owed a duty clearly and vastly narrower in scope than the one that the other party asserts."[5] Greenway argues that Hurn has alleged no facts that would give rise to a duty to refrain from her dance with Carrie. Hurn responds that Greenway had such a duty either because she had a special relationship with her guests as a landowner or because there is a general duty not to provoke a third party when violence is the foreseeable result.

---

[3] *See State v. Sandsness*, 72 P.3d 299, 301 (Alaska 2003) (citing *Beck v. State, Dep't of Transp. & Pub. Facilities*, 837 P.2d 105, 109 (Alaska 1992)).

[4] *Nielson v. Benton*, 903 P.2d 1049, 1051-52 (Alaska 1995).

[5] *Arctic Tug & Barge, Inc. v. Raleigh, Schwarz & Powell*, 956 P.2d 1199, 1203 (Alaska 1998).

**A.    Greenway Did Not Have A Special Relationship With Carrie Or Jeffrey That Would Give Rise To A Duty.**

Generally, a person has no duty to protect others from harm by a third party.[6] But the Restatement (Second) of Torts § 315 recognizes such a duty if there is a special relationship between the parties:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection.[7]

Hurn argues that Greenway had a special relationship with both Jeffrey and Carrie because Greenway owned the property and Jeffrey and Carrie were invitees. But Alaska has abolished the common law distinction between licensees, invitees, and trespassers.[8] Instead, a landowner has a general duty to "act as a reasonable person in maintaining his property in a reasonably safe condition in view of all the circumstances."[9] This generally does not include the duty to control guests in the home. In *Schumacher v. City & Borough of Yakutat*, we held that "landowners have a duty to

---

[6]    *See, e.g.*, *Parnell v. Peak Oilfield Serv. Co.*, 174 P.3d 757, 762 (Alaska 2007); *Bryson v. Banner Health Sys.*, 89 P.3d 800, 804 (Alaska 2004); *Dore v. City of Fairbanks*, 31 P.3d 788, 793 (Alaska 2001).

[7]    RESTATEMENT (SECOND) OF TORTS § 315 (1965). Section 315 is well established in Alaskan case law. *See, e.g.*, *Wongittilin v. State*, 36 P.3d 678, 683 (Alaska 2001); *Dore*, 31 P.3d at 793.

[8]    *See Webb v. City & Borough of Sitka*, 561 P.2d 731, 733 (Alaska 1977), *superseded in part by statute,* AS 09.65.200, *as recognized in Univ. of Alaska v. Shanti*, 835 P.2d 1225, 1228 n.5 (Alaska 1992).

[9]    *Id.*

use due care to guard against unreasonable risks created by dangerous conditions existing on their property" but "[a]side from activities induced by 'attractive nuisances,' the definition of 'conditions' that landowners may be required to protect against does not include the conduct of third parties."[10]  We clarified in *Estate of Mickelsen ex rel. Mickelsen v. North-Wend Foods, Inc.* that a landowner might have a duty to control the actions of a third party if those actions were sufficiently related to a condition on the land,[11] but here Greenway's taunting dance was unrelated to conditions on her property or in her home.  Therefore Greenway's ownership of the property cannot make her liable for Carrie's death.

B.      **Greenway Did Not Have A Duty Not To Provoke Jeffrey.**

Hurn argues that Greenway had a duty not to provoke Jeffrey by dancing seductively with his wife.  The Restatement (Second) of Torts § 302B would hold actors liable if they unreasonably increased the risk of crime:

> An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal.[12]

In such a case, the criminal act is not an intervening cause that would sever liability.[13]

---

[10]     946 P.2d 1255, 1258 (Alaska 1997) (footnote omitted).

[11]     274 P.3d 1193, 1202 (Alaska 2012) (interpreting the duty to "maintain property in a reasonably safe condition" to mean that the property owner may have had a duty to maintain its driveway in such a way as to reduce the likelihood of accidents caused by third parties).

[12]     RESTATEMENT (SECOND) OF TORTS § 302B.

[13]     RESTATEMENT (SECOND) OF TORTS § 449 ("If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes

(continued...)

Unlike § 315, we have never adopted § 302B.[14]  We do not decide today whether § 302B applies in Alaska because even if it does, Greenway is not liable for Jeffrey's crimes.

**1.   If § 302B is controlling in Alaska, it would not support liability in this case.**

**a.   The text of the Restatement does not support liability.**

The text and comments of § 302B do not support the imposition of a duty. Comment d makes it clear that an actor is responsible for the crimes of third parties only in unusual circumstances:

> Normally the actor has much less reason to anticipate intentional misconduct than he has to anticipate negligence. In the ordinary case he may reasonably proceed upon the assumption that others will not interfere in a manner intended to cause harm to anyone.  This is true particularly where the intentional conduct is a crime, since under ordinary

---

[13](...continued)
the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby.").

[14]    Although we have cited § 302B several times in dicta, this court has never invoked that section as a source of liability. *See Bryson v. Banner Health Sys.*, 89 P.3d 800, 805 n.11 (Alaska 2004) (quoting almost identical language in *Prosser and Keeton on Torts* for the proposition that a special relationship may yield a duty to protect another from a third party); *Joseph v. State*, 26 P.3d 459, 471 n.67 (Alaska 2001) (citing § 302B for the proposition that "a reasonably foreseeable occurrence cannot be an intervening/superseding cause if the actor has a duty to prevent that occurrence"); *Wilson v. City of Kotzebue*, 627 P.2d 623, 630 n.10 (Alaska 1981) (citing § 302B to reject a jury instruction that "[e]very person who, himself, is exercising ordinary care, has a right to assume that every other person will perform his duty and obey the law").

circumstances it may reasonably be assumed that no one will violate the criminal law.[15]

Comment e creates an exception to this rule "where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account."[16] Hurn argues that Greenway's dance created this "recognizable high degree of risk." But the illustrations to comment e convince us that a tortfeasor's "affirmative act" must rise above mere teasing to find a home in this exception.

The Restatement gives four examples of affirmative acts sufficient to sustain liability under § 302B for the criminal acts of another:[17]

1.     The actor takes affirmative steps to defeat a protection the victim placed around his person or property;

2.     The actor brings the victim and criminal into contact with each other under circumstances which afford a great opportunity for misconduct;

3.     The actor provides the instrument of the crime to the criminal; or

4.     The actor "acts with knowledge of peculiar conditions which create a high degree of risk of intentional misconduct."[18]

The list is not exhaustive, but these examples indicate that "affirmative act" in comment e refers to substantial misfeasance that unmistakably points toward

---

[15]     RESTATEMENT (SECOND) OF TORTS § 302B cmt. d.

[16]     RESTATEMENT (SECOND) OF TORTS § 302B cmt. e.

[17]     *Id.* These examples have been paraphrased. Comment e would also hold an actor liable for the crimes of a third party if the actor has a special relationship with the victim, and the Restatement gives additional examples of such relationships. But as we have discussed above, no such special relationship was present here.

[18]     RESTATEMENT (SECOND) OF TORTS § 302B cmt. e.H.

culpability. The only two categories into which Greenway's dance could possibly fit are the second and fourth: bringing the victim and criminal into contact with each other and acting "with knowledge of peculiar conditions which create a high degree of risk of intentional misconduct." As to the second category, Hurn conceded at oral argument before us that simply driving Carrie and Jeffrey to the same house is not enough to sustain liability and that Greenway cannot be said to have brought the married couple into contact with each other. And the illustration to the fourth example suggests that the degree of risk required to impose liability must be closer to "certainty of harm" than the mere suspicion of danger entertained by Greenway. In the illustration, a railroad knows that its employees are on strike and are tearing up tracks and attempting to wreck trains, but the railroad fails to guard its tracks and runs its trains as normal. The railroad is negligent. But both the railroad's knowledge of "peculiar conditions" and the risk to the victims in this example are of a different kind and quality than in the present case because the criminal element was manifest before the railroad's decision to run the trains. There is nothing to suggest a sufficient degree of risk to create a duty in this case.

### b.     Liability in this case would be unprecedented.

The Restatement is authoritative only as a statement of the common law, and no court has ever stretched § 302B to impose a duty in a case like this one. Such a duty cannot be found in our own precedent, and other courts have frequently declined to impose a duty in similar circumstances.[19]

---

[19]     *See, e.g., Fiala v. Rains*, 519 N.W.2d 386, 389 (Iowa 1994) (holding that it was not foreseeable that an abusive boyfriend would be waiting to attack another man that his girlfriend brought home one night); *Taylor v. Louis*, 349 S.W.3d 729, 737 (Tex. App. 2011) (holding that violence was not the foreseeable result of opening the door to an abusive and upset ex-husband while a new boyfriend was over); *Kim v. Budget Rent A Car Sys., Inc.*, 15 P.3d 1283, 1285 (Wash. 2001) (en banc) (holding that it was not
(continued...)

Hurn cites *Pamela L. v. Farmer*,[20] a case from the California Court of Appeal, as support. In *Pamela L.*, a wife invited children to swim in her pool, promised their parents they would be safe, and left the children alone in the care of her husband who was a convicted child molester.[21] After the children were assaulted, the court held that a jury could find the wife liable under § 302B because she unreasonably increased the risk of the attack.[22] But this is not like the present case. The wife in *Pamela L.* was liable because she brought the victims into contact with her husband and lied to the children's parents, thereby defeating their protection. In contrast, Greenway's dance may have provoked but did not facilitate Jeffrey's rampage. Greenway did not defeat a protection Carrie had erected around herself, nor was Greenway responsible for bringing the parties together.

A review of other cases where § 302B has been invoked to support liability reveals similar distinctions.[23] In some cases the tortfeasors provided the instrument of

---

[19](...continued)
foreseeable that a third party would steal a minivan that had been left in a safe part of town, unlocked with the keys in the ignition, and cause a crash).

[20]    169 Cal. Rptr. 282 (Cal. App. 1980).

[21]    *Id.* at 284.

[22]    *Id.* at 284-85.

[23]    The only case we are aware of with similar facts where the court found liability is *Touchette v. Ganal*, 922 P.2d 347 (Haw. 1996). In *Touchette*, a wife repeatedly flaunted her love affair in front of her husband. *Id.* at 349. In response, the husband murdered his wife's parents and set fire to the lover's house and office, killing and injuring several more people. *Id.* at 348-49. The Supreme Court of Hawai'i vacated the trial court's order granting a motion to dismiss, holding that, if the plaintiffs proved their allegations that the wife taunted and humiliated the husband and caused him "to suffer severe and extreme emotional and mental distress and depression," a jury could
(continued...)

harm;[24] in others they brought the parties together knowing that violence was likely.[25] And acceptance of even this narrow application of § 302B is not universal.[26]  Hurn does not argue that Greenway was negligent for driving Carrie and Jeffrey — at Carrie's request — to her house.  Nor does he contend that Greenway supplied Jeffrey with the means to commit the crime.  Therefore, a duty in this case cannot be rooted in the precedent of this or any jurisdiction.

---

[23](...continued) find the wife negligent under § 302B.  *Id.* at 358.  But the allegations in that case were more severe than the uncontested facts in this one.

[24]    *See Parilla v. King County*, 157 P.3d 879, 886 (Wash. App. 2007) (holding a county owed a duty of care to injured motorists after a bus driver exited his bus with the keys in the ignition and the engine running, and left an obviously violent and disturbed individual unsupervised on board).

[25]    *See, e.g.*, *Bendowski v. Quinnipiac College*, No. CV 950248346S, 1996 WL 219532, at *1-2 (Conn. Super. Apr. 8, 1996) (sexual assault victim invited her cousin over, described the assault to him, discussed the cousin assaulting her attacker, and gave the cousin information about where the attacker lived on campus); *Molino v. Coluzzi*, No. L-283-08, 2011 WL 1584338, at *1-2 (N.J. Super. App. Div. Apr. 28, 2011) (defendant provoked a woman's upset and jealous boyfriend by telling him that his girlfriend was involved with another man, and then drove with him to the man's house); *Strahin v. Cleavenger*, 603 S.E.2d 197, 203-04 (W. Va. 2004) (plaintiff was shot after defendant invited him over to lay block despite knowing that a shooter was stalking the defendant, was violently angry, had vandalized defendant's property, and was armed).

[26]    *See Strahin*, 603 S.E.2d at 213 (Maynard, C.J., dissenting) ("This reasoning expands the scope of foreseeability beyond all bounds of common sense, fairness, and public policy.  As an example, under this rule, if I have had a conflict with another person that has erupted into a verbal or physical altercation, I am charged with presuming that person will commit a criminal and violent act against me.  Therefore, I arguably commit negligence by permitting a third party simply to ride in my car or visit my property.").

**2.** **If § 302B is not controlling, we decline to impose a duty of our own accord.**

If § 302B does not control, we may impose a duty of our own accord.[27] We decline to do so here. The process of finding a duty is simply "an attempt to determine whether it would be fair and equitable to require an individual to act, or to refrain from acting, in a specified manner so as to avoid undue risk of harm to third persons."[28] In *D.S.W. v. Fairbanks North Star Borough School District*, we identified several factors to guide this inquiry.[29] Of these, foreseeability of harm is the most important, followed closely by the burden on the defendant and the consequences to the community: there can be no duty where the harm is unforeseeable,[30] but foreseeability alone is insufficient to establish a duty if the burden of taking care or the effect on society is too harsh.[31]

---

[27]     *See Estate of Mickelsen ex rel. Mickelsen v. North-Wend Foods, Inc.*, 274 P.3d 1193, 1199 (Alaska 2012) (stating rule that courts should look first to statute, then to precedent, and then to public policy to determine if a duty of care exists).

[28]     *Busby v. Municipality of Anchorage*, 741 P.2d 230, 233 (Alaska 1987).

[29]     628 P.2d 554, 555 (Alaska 1981). These factors are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

[30]     *See P.G. v. State, Dep't of Health & Human Servs., Div. of Family & Youth Servs.*, 4 P.3d 326, 333 (Alaska 2000)*; Div. of Corr., Dep't of Health & Soc. Servs. v. Neakok*, 721 P.2d 1121, 1127 (Alaska 1986), *overruled on other grounds by State, Dep't of Corr. v. Cowles*, 151 P.3d 353 (Alaska 2006); *State v. Guinn*, 555 P.2d 530, 536 (Alaska 1976).

[31]     *See Kooly v. State*, 958 P.2d 1106, 1108 (Alaska 1998) (declining to impose
(continued...)

### a. Jeffrey's violence was not foreseeable.

Foreseeability is the most important *D.S.W.* factor,[32] so we must decide whether Jeffrey's violent rampage was a foreseeable result of Greenway's provocative dance. Hurn argues that foreseeability is a question of fact more fit for jury than judge. But the question of duty is a matter of law.[33] And summary judgment is appropriate where the only reasonable inference from the undisputed facts is that the harm was not foreseeable.[34]

Hurn also argues that Jeffrey's precise acts need not have been foreseeable. This is true. We have held that "foreseeability is a broad concept and does not require that the precise harm in a given case be predictable."[35] Instead, the manifested harm "need only be one of the cluster of harms in a generally foreseeable category."[36] But this

---

[31] (...continued)
liability despite the fact that harm was foreseeable because the burden on the defendant and the consequences to the community were too harsh); *Schumacher v. City & Borough of Yakutat,* 946 P.2d 1255, 1257 (Alaska 1997) (same); *see also Trapp v. State, Office of Pub. Advocacy*, 112 P.3d 668, 675 (Alaska 2005) (ceasing examination of the *D.S.W.* factors and declining to impose a duty after determining that "there would be a significant 'burden to the defendant and consequences to the community' if we imposed an extra-statutory duty of care").

[32]   *See State v. Sandsness*, 72 P.3d 299, 305 (Alaska 2003); *Karen L. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 953 P.2d 871, 875 (Alaska 1998) (citing *R.E. v. State*, 878 P.2d 1341, 1346 (Alaska 1994)).

[33]   *See Sandsness*, 72 P.3d at 301.

[34]   *See Arctic Tug & Barge, Inc. v. Raleigh, Schwarz & Powell*, 956 P.2d 1199, 1203 (Alaska 1998).

[35]   *P.G.*, 4 P.3d at 331 n.11.

[36]   *Winschel v. Brown*, 171 P.3d 142, 147 (Alaska 2007) (quoting DAN B. (continued...)

theoretical category of harms must be sufficiently related to the actual injury that occurred. It is not enough that Greenway could foresee Jeffrey's anger; the question is whether Greenway could foresee his indiscriminate armed attack.

And this does not answer the more fundamental question of what it means for a harm or category of harms to be "foreseeable" at all. In the past we have acknowledged that the foreseeability inquiry has as much to do with public policy as the ability to predict the future: "foreseeability is a question of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results."[37] We have also adopted a more practical test: "[t]he actor's conduct may be held not to be a legal cause of harm to another where after the event and *looking back* from the harm to the actor's negligent conduct, it appears to the court *highly extraordinary* that it should have brought about the harm."[38] As we have noted above, the Restatement tells us that third-party crimes are rarely foreseeable.[39]

We conclude that Jeffrey's shooting spree was a highly extraordinary response to Greenway's dance. Hurn argues that foreseeability can be inferred because Greenway knew that Jeffrey had threatened Carrie with physical harm in the past; Carrie was afraid that Jeffrey would kill her; Jeffrey was a jealous man; on the night of the

---

[36](...continued)
DOBBS, THE LAW OF TORTS 336 (2001 & Supp. 2007)) (internal quotation marks omitted).

[37]     *P.G.*, 4 P.3d at 334 (quoting W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 43, at 281 (5th ed. 1984)) (internal quotation marks omitted).

[38]     *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 435(2) (1965)) (emphasis in original).

[39]     RESTATEMENT (SECOND) OF TORTS § 302B cmt. d.

murder Jeffrey sometimes wore a "stone cold expression" that betrayed no emotion; and prior to Greenway's dance, he had issued a veiled threat: "What would you girls do if someone came in that door right now, after you?"

We read these facts in the light most favorable to the plaintiff, but as a matter of law they cannot overcome the presumption that the criminal acts of third parties are unforeseeable. It is not clear that homicide could ever be the foreseeable result of mere teasing, and Greenway could not foresee such violence here.

**b.** **The burden of the duty on Greenway and the consequences to the community are too harsh.**

The burden the proposed duty would place on Greenway and society also weighs against its imposition. Hurn asks us to reduce domestic violence in this state by imposing a duty to "refrain from teasing or bullying someone known to be potentially violent." But we refuse to give victims the duty to prevent their own abuse and then hold them liable when they fail. The record suggests that Jeffrey was an abusive husband.[40] And if Greenway is liable for taunting an abusive husband, it follows that victims themselves may be liable for provoking their partners if the result is harm to a third party. Some courts have already been asked to hold a recipient of domestic abuse liable under § 302B for the crimes of her partner. The Iowa Supreme Court held that a woman was not liable for the actions of her jealous and abusive boyfriend after he assaulted another man she brought home.[41] These requests are particularly troubling where, as here, the

---

[40] Besides murdering his wife, Jeffrey verbally abused Carrie and threatened to beat her, and Carrie was afraid for her life. On at least one occasion Carrie spent the night sleeping on a friend's floor because she was afraid of her husband. The record is silent as to physical abuse, but it is undisputed that their relationship was marked by threats and fear.

[41] *See Fiala v. Rains*, 519 N.W.2d 386 (Iowa 1994); *cf. Wilkins v. Siplin*, 13

(continued...)

"provocation" is an act of resistance.[42] We reject the idea that victims are responsible for the violence they endure in the home, and we will not blame them for their otherwise reasonable actions simply because those actions foreseeably result in violence.

## V.   CONCLUSION

Simone Greenway had no duty to protect Carrie Randall-Evans or control Jeffrey Evans because she did not share a special relationship with either of them. Nor did Greenway have a duty to refrain from provoking Jeffrey by dancing with his wife. We therefore AFFIRM the superior court's grant of summary judgment in favor of Simone Greenway.

---

[41](...continued)
Cal. Rptr. 2d 634 (Cal. App. 1992) (holding that a wife could be liable for inviting a co-worker to a remote cabin where he was attacked by her husband) (depublished by order of the California Supreme Court).

[42]    The sparring, dancing, and teasing at issue were a direct response to Jeffrey's not-so-veiled threat to Carrie and Greenway's physical safety: "[W]hat would you girls do if somebody came in that door right now, after you?"  In response, Carrie and Greenway laughed, gave each other a high five, said "[W]e'd kick his ass," and started sparring to demonstrate how they would repel the intruder.  While they were sparring and dancing and laughing at Jeffrey, Greenway was expressing to Carrie: "[T]his is my domain, you don't have to be afraid here."